## MISSOURI STATE LIFE INS. CO. v. KEYES.

District Court, W. D. Kentucky.
March 18, 1933.

COCHRAN, District Judge.

This suit is before me on petition for rehearing filed by the defendant against whom a decree was entered upon the hearing. It was for the amount of two certificates of deposit issued by the National Bank of Kentucky, of which the defendant is receiver, and upon which the suit was brought. Each certificate was dated August 21, 1930, was for $250,000, and provided that it was payable to plaintiff's order six months after date after thirty days' notice with interest at the rate of 3% per annum. They were issued prior to the closure of the Bank which took place November 17, 1930. The defendant had filed an answer setting up what he conceived to be a defense to the suit and on the hearing, in advance of the introduction of the evidence, a statement was made on his behalf of the facts which he expected to establish in support of his defense. I held that the facts stated did not make out a good defense to the suit and adjudged the plaintiff was entitled to a decree. It is not claimed the statement did not cover fully the facts which defendant expected to prove. The question before me, on this petition, therefore, is whether according to that statement plaintiff was entitled to the decree.

The statement was rather extended but the substance thereof can be presented in brief form. The two certificates were issued in substitution for two such certificates, of like tenor, issued by the Bank to Caldwell & Co., the day of their date, and shortly thereafter sold and assigned by Caldwell & Company to plaintiff for their face value, $500,000, then and there paid by the latter to the former. One was issued September 5, 1930, pursuant to plaintiff's request of August 27, 1930, and the other September 16, 1930, pursuant to such request of September 13, 1930. These two original certificates were given for the proceeds of a loan made August 21, 1930, by the Bank to the Associated Life Company, Inc., evidenced by the latter's promissory note secured by certain collateral. At the time of the loan and as a condition precedent to the issuance of the certificates the Associated Life Companies, Inc., through its secretary delivered to the Bank a letter addressed to it, containing these words: "You have today granted loan of $500,000 to this Company from which proceeds we have purchased two $250,000 certificates of deposit from your Bank in the name of Caldwell & Co. We hereby agree and guarantee that the certificates of deposit will not be cashed only in the reduction of the above mentioned loan." $300,000 has been realized from the collateral placed to secure the loan, leaving $200,000 still unpaid.

Caldwell & Company was a corporation engaged in the brokerage and promotion business at Nashville, Tenn. Rogers Caldwell was its president and he and his father, James E. Caldwell, both of whom lived in Nashville, owned its capital stock and completely dominated its affairs. The Associated Life Companies, Inc., was a corporation engaged in business, possibly at Nashville. The nature of its business does not appear. It was dominated by Caldwell & Co. and was a mere dummy organization created and existing for that corporation. G. C. Arnett was its president and he and

Rogers Caldwell were directors of it. The plaintiff was a corporation engaged in life insurance business at St. Louis, Missouri. Hillsman Taylor was its president and Rogers Caldwell, James E. Caldwell and G. C. Arnett were directors of it. It does not appear that there were not other directors. It is likely that there were. Its executive committee were composed of Taylor, the two Caldwells and Arnett. This committee, acting on behalf of plaintiff, purchased the two original certificates from Caldwell & Co., for whom Rogers Caldwell acted in the transaction. Caldwell & Co. had at one time owned as much as 70% of plaintiff's capital stock and at the time of the transaction in question owned 30%. Through Rogers Caldwell it dominated plaintiff. His will determined its action, particularly in the matter of its investments. Instances of this were set forth. Though plaintiff's home office was at St. Louis, 75% of the meetings of the executive committee and board of directors were held in Nashville in Caldwell & Co.'s offices or in an office next door thereto, to which many of its books and papers had been transferred. Rogers Caldwell and G. C. Arnett knew of the side agreement made by the Associated Life Companies, Inc. They were present at the time of the transaction. It was not stated that James E. Caldwell had actual knowledge thereof, nor that facts would be shown that would justify the inference that he had such knowledge. The statement was that he "must have known it because of his close connection with Caldwell & Co. and all these others and the like of that" and that he "knew about it, perhaps not as much as the others." It was not stated that Taylor had any knowledge of such agreement. The statement as to him was that "if he exercised his proper duty in investigating about the big investment of his big Life Insurance Company, would have known about it." It was further stated that Taylor had testified by deposition that he did not know anything about it. After plaintiff's request that the substituted certificates be issued and before they were issued Rogers Caldwell had a conference with the President and a Vice President of the Bank in which they said "Mr. Caldwell, this isn't according to the agreement; the agreement provides that these certificates will not be cashed except in payment of that Associated Life Companies note," and Caldwell agreed with them that the agreement made by the Associated Life Companies would be binding on plaintiff and that plaintiff would not cash those certificates of deposit except and unless the note had been paid.

Such then I take to be a fair statement of the facts on which defendant based its defense. As $300,000 had been realized from the collateral placed to secure the note leaving $200,000 unpaid, if a defense at all, they were only such to the extent of $200,000. That defense was that the original certificates of deposit were not to be paid until the loan to the Associated Life Companies, Inc. note was paid—that this agreement constituted an infirmity in the certificates which would affect one purchasing them if he had knowledge thereof—that the plaintiff was chargeable with Rogers Caldwell's knowledge thereof—and that by reason of the agreement with Rogers Caldwell before the issuance of the substituted certificates those certificates were affected by the same condition and infirmity as the originals. They were not to be paid until the note of the Associated Life Companies, Inc., note was paid.

1. Two questions are presented here. One is whether plaintiff would have been entitled to recover had there been no substitution and the suit had been brought upon the originals. This depends upon the effect of the side agreement and whether plaintiff was chargeable with notice thereof. It is not certain that the effect of that agreement was to import a condition in the certificates that they were not to be paid until the note of the Associated Life Companies, Inc., was paid. The certificates were not pledged as collateral to secure the note. It was secured by other collateral out of which $300,000 has been realized. Caldwell & Company to whom the certificates were issued did not execute the agreement. It was executed only by the Associated Life Companies, Inc. Nor did it provide that the certificates were not to be sold. It must have been realized that if they were sold to an innocent purchaser he would be unaffected by the agreement. The likelihood of Caldwell & Co. making such a sale, if it could, was so great that it must have been anticipated. The note of the Associated Life Companies, Inc., bore six per cent interest whereas the certificates only bore 3%. According to defendant's claim that corporation was the same as Caldwell & Co. The conclusion is hardly to be resisted that the whole object of the transaction was to provide Caldwell & Co. with resources. It was put into two certificates instead of

one, which would facilitate their negotiation. So far as the agreement is concerned, it was merely the personal guarantee of the Associated Life Companies, Inc., that the certificates would not be presented for payment until its note had been paid. It resembles much the side agreement involved in the case of Title Guaranty & Trust Co. v. Pam, 232 N.Y. 441, 134 N.E. 525, 527, cited by defendant on the other point involved here. Concerning that agreement it was said: "We are unable to accept the ruling that delivery was conditional, and negotiation a breach of faith. No condition was expressed. We think that none is to be implied. The defendant argues that the promise to adjust was of little use if the note could be transferred. It is perhaps a sufficient answer that the note itself was of little use if transfer was forbidden. * * * The evidence is unmistakable that the defendant permitted and expected the discount of his notes. He was willing to take the chance of a transfer to a holder without notice, relying on the builder's responsibility, and its promise of indemnity, if mistake was afterwards established. * * * The notes were delivered, not conditionally, but as presently operative contracts, with the understanding that the payee was at liberty to use them."

■ I will assume, however, that the effect of this side agreement was as defendant claims it to have been. How is it as to his claim that plaintiff was chargeable with notice of this agreement at the time it purchased the certificates? He bases this claim largely, if not entirely, on the knowledge of Rogers Caldwell, and this because of his dominating relation to plaintiff. I do not think that plaintiff is chargeable with his knowledge of the existence of the side agreement. It is to be noted that he did not acquire that knowledge whilst acting for plaintiff. He acquired it whilst he was acting for himself rather perhaps for Caldwell & Co. And then it was against his interest to let plaintiff know of such agreement. It was to his interest to conceal it from plaintiff. In the sale of the certificates to plaintiff he was really acting for Caldwell & Co. and not for plaintiff. This position is sustained by the decisions in the cases of American Nat'l Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310; Ohio Miller's Mut. Ins. Co. v. Artesia State Bank, 5 Cir., 39 F.2d 400, cited by plaintiff. In American National Bank v. Miller one Plant was president of First National Bank of Macon, Ga. He owed American National Bank of Nashville, Tenn., $50,000 and had a deposit with it in excess of $3,000. On May 13, 1904 his account with his own bank at Macon was overdrawn between $75,000 and $100,000. A national bank examiner was in the city to examine the bank. To pay this balance he gave it bank checks and commercial paper. One check was for $3,000 on the Nashville bank. It sent same to that bank for collection. It received the check May 16th at 8 A. M. and at 11 A. M. credited it to the Macon bank. About 2 P. M. it charged the check to Plant's account and on the same day it mailed a letter to the Macon bank stating that its account had been credited with $3,000. An hour or so before 11 A. M., when it credited the check to the Macon bank, a petition in bankruptcy was filed against Plant. This precipitated a run on his bank and on the same day a receiver was appointed for it by the Comptroller. The Nashville bank was not aware of those proceedings on that day. Four or five days later having learned of them it cancelled the $3,000 credit to the Macon bank. Thereafter action was brought on its behalf to recover the $3,000. The Nashville bank's defense was that Plant was insolvent when he gave his check and it was mailed for collection and it was received and paid by it—that because thereof it had the right to set off his indebtedness to it against his account with it and refuse to pay the check—that it was not aware of such insolvency—and that the Macon bank was. It was claimed that by reason of the concealment of such insolvency from it the Macon bank had practiced a fraud upon it which entitled it to cancel the credit. The question in the case was whether the Macon bank knew of the insolvency of Plant, its president. It was not claimed that it knew it otherwise than on the ground that Plant knew it. The claim was that "what he knew the bank must be considered as knowing." It was held that the bank was not chargeable with his knowledge. The court said [229 U.S. 517, 33 S. Ct. 884, 57 L.Ed. 1310]: "But if the fact of his own insolvency and of his personal indebtedness to the Nashville bank were matters which it was to his interest to conceal, the law does not by a fiction charge the Macon bank, of which he was president, with notice of facts which the agent not only did not disclose, but which it was interested in concealing."

It said further: "It was to his personal interest to conceal any fact which would prevent the Macon bank from receiving paper in satisfaction of a debt which had been unlawfully contracted by reason of his official position. An element of that interest was that he should conceal not only the fact of his insolvency, but the fact of his indebtedness to the Nashville bank, lest the Macon bank should thereby refuse to take the $3,000 check at its face value. Without, therefore, inquiring as to what would have been the duty of the Macon bank had it known of Plant's insolvency and indebtedness on the $50,000 drafts, we hold that as it had no such knowledge in fact, it was not charged with such knowledge in law."

Defendant urges that this decision is not in point here. It says that the most casual analysis of the decision will show its complete inapplicability to this case in that the fact situation is entirely different. There are two particulars which it claims that there is such difference. The last one is thus put: "It did not appear that Plant had any other interest in the Macon Bank except the office of President. It was not shown that he was a stockholder, that he controlled and determined the policies and managed the business of the bank or that there was any identity between him and the bank whatsoever except the mere office which he held:"

This claim is easily refuted. It appears from the opinion of the lower court in American Nat. Bank v. Miller, 6 Cir., 185 F. 338, 340 that Plant was a large stockholder and general manager of the Macon bank as well as president. In the opinion of the Supreme Court it is said that Plant "so far dominated as to compel it to take care of the large balances against him in the clearing house, frequently more than 50 per cent of the $200,000 capital of the Macon Bank." As heretofore stated, when the national bank examiner turned up in Macon his account with his bank was overdrawn from $75,000 to $100,000. There is not the slightest reason to doubt that his domination of the Macon bank was as complete as the domination of Rogers Caldwell of the plaintiff.

The other particular is put that Plant "was not acting in a representative capacity for the Macon bank, he was acting for himself in paying off his indebtedness to the Macon bank just as though he was a stranger to the bank and dealing with it at arm's length." According to this, Plant was not on both sides of the transaction. He gave the check and had nothing to do with taking it on behalf of the bank. There is nothing in the facts of the case as reported to justify this position. It is consistent with them that Plant as president and general manager took from himself the check which he gave it. Figuratively speaking it is possible, if not probable, that Plant holding the check in his right hand for himself took it therefrom with his left from the bank. Then it is the implication of this position that here Rogers Caldwell was on both sides of the transaction. He not only sold the certificates on behalf of Caldwell & Co. to plaintiff but as a member of plaintiff's executive committee purchased them on its behalf. This is calculated to make one laugh. Rogers, in reality, was on only one side of the transaction and that the side of Caldwell & Co. in making the sale. He did not in reality act for the plaintiff in making the purchase. Jesus said: "No servant can serve two masters; either he will hate the one and love the other, or else he will stand by the one and despise the other."

A further utterance of His brings out whom Rogers Caldwell stood by, loved and served in this transaction. It was: "For where your treasure lies, Your heart will lie there too."

Here Rogers Caldwell's treasure was with Caldwell & Co. and there is where his heart lay. In the transaction here involved he stood by, loved and served that concern, and it only. What is here stated is not only the Gospel, but it is also the law. In the case of Thomson-Houston Electric Co. v. Capitol Electric Co., 6 Cir., 65 F. 341, 343, Judge Taft said: "The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing fraud, for his own benefit, he is acting outside of the scope of his agency."

In fact the decision of the Supreme Court in that case is directly in point as to this case. In each instance the agent dominated the principal—the knowledge on the part of the agent with which it was claimed the principal was chargeable had been acquired by the agent whilst acting, not merely within the scope of his employment, but whilst not acting as agent at all for the principal, but on his own account solely—and it was to the interest of the

agent to conceal the knowledge so acquired from the principal. In neither instance, in so far as the agent acted ostensibly for the principal in the transaction, did he act on account of his principal. He acted really on his own account only, because of his adverse interest. But it is said that the Supreme Court in the later case of Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 572, 67 L.Ed. 956, has explained and expressly modified its decision in American National Bank v. Miller, and that the decision therein conclusively demonstrates the inapplicability of that case to this case. It is true that the Supreme Court in that case explained its former decision. It distinguished it therefrom. But to no extent did it modify that decision, much less expressly so. The defendant presents an excellent statement of the facts of that case and I adopt it: "One Holbrook entered into a partnership with Curtis and Collins, the purpose of which was to purchase certain land for the Company. Holbrook was designated as agent to represent the Company and to acquire the land and to see to it that good titles were obtained. Holbrook received a fee or commission on each land title that he secured. In addition to that he had a financial interest of one sixth in the Company and would profit if the Company profited in the deal. Thus he was acting as agent for a Company which he in part owned and managed and also was making a direct personal financial profit in the transaction. It appears that he purchased for the Company a number of parcels of land which he knew had defects in their title, that he concealed this information from the other stockholders of the Company as principals, and an action was then brought by the United States to set aside the transaction."

■ It should be stated that the lands involved were United States lands. The defects in the titles procured were due to the fact that fraud had been practiced on the government in the purchase of the lands. It was held that the company was affected by Holbrook's knowledge of the fraud and that the United States was entitled to recover. The case in its facts differs from the case in hand in one vital particular. That particular was that there Holbrook acted as agent on behalf of the company in the purchase of the lands from the government, whereas here Caldwell did not represent the plaintiff in the procuring of the certificates of deposit from the Bank. He acted solely and alone for Caldwell & Co. in that transaction. It is true that he ostensibly and formally acted for plaintiff as a member of its executive committee in the purchase of the certificates from Caldwell & Co. That circumstance did not bring the case within the facts of the Curtis, Collins & Holbrook Co. case. It was essential that he should have acted for plaintiff in the procurement of the certificates from the bank in order to do this. And though ostensibly and formally he so acted for plaintiff in the purchase of the certificates from Caldwell & Co. as we have seen, he did not so in reality act. Really he was not on both sides of the transaction. He was on but one and that the side of Caldwell & Co. What this case lays down is that where one acts as agent for another in the purchase of property the principal is affected by the fraud of the agent in such purchase, even though the agent is interested in concealing and does conceal such fraud from the principal. In the purchase he is not only ostensibly and formally but really acting for the principal. The principal cannot hold on to the benefits of his action and repudiate the action itself. The court said: "The general rule is that a principal is charged with the knowledge of the agent acquired by the agent in the course of the principal's business. Here the business was the acquisition of land patented by the government under the Timber and Stone Act. The company and all its stockholders were charged with notice of any facts impairing the titles, of which, in securing them, Holbrook was advised. In other words, the company, in taking over the titles, took them cum onere."

Here the defendant would burden plaintiff not with anything that had to do with bringing about the sale of the certificates by Caldwell & Co. to plaintiff, but with what had to do with bringing about the issuance thereof by the bank to Caldwell & Co.

The court distinguished the case of American National Bank v. Miller from that case in these words: "The president of the Macon bank was engaged in something in which his interest was plainly independent of any agency of his on behalf of his bank. His payment of his note [overdraft?] was his own business, and not the bank's as his principal. In the case at bar, Holbrook was the sole agent acting for the company in securing titles to land for it. It is true that, the more titles he got,

the more profit he would make out of the agency, and we may assume that, as between him and the company, in securing fraudulent titles for the company, he was violating his instructions; but he and the company were in a common adventure, and, if the company insists on retaining the fruits of that adventure, it must be charged with the knowledge of the agent through whom the fruits came. The interest of Collins, Curtis and Holbrook in the acquisition of the titles was common. Curtis and Collins knew exactly how far Holbrook's interest was adverse to theirs, but trusted him in the joint enterprise notwithstanding. The adverse interests as between them in sharing the fruits of the common business cannot enable the company to retain its share and repudiate the agent with all he knew."

The significance of characterizing Holbrook as "sole agent" was that through him and through him only the lands were acquired.

Here plaintiff would not hold onto the certificates of deposit and repudiate anything which had to do with its acquisition of them. What it would repudiate is that which had to do with the issuance thereof by the bank to Caldwell & Co. It had nothing whatever to do with bringing about that transaction. Caldwell & Co. was not acting as its agent through Rogers Caldwell in bringing it about on their own account.

▓ The decision in the case of Ohio Miller's Mutual Insurance Company v. Artesia State Bank, the other case relied on by plaintiff, is a very strong one in support of its right to the decree. Three corporations were involved in the transaction out of which it grew. Two were insurance companies, the Ohio Millers' Mutual Insurance Company, which wrote workman's compensation, and the Integrity Mutual Casualty Company, which wrote casualty insurance. Both had offices together. The third corporation was J. C. Adderly, Inc. Its business was insurance management. It managed the respective insurance businesses of the two insurance companies. J. C. Adderly was president of all three corporations. They had also the same vice-president, secretary-treasurer and general counsel. The two insurance companies were mutual companies and had different directors and policyholders. The Integrity Mutual Casualty Company issued $50,000 of bonds and sold them to J. C. Adderly, Inc. That corporation placed them in the hands of an investment broker for sale for it. On February 22, 1926, he sold $5,000 of these bonds to the Artesia State Bank and it issued its certificate of deposit to J. C. Adderly, Inc. for its proceeds. On March 20, 1926, J. C. Adderly, Inc., sold and assigned this certificate of deposit to the other insurance company, the Ohio Miller's Insurance Company for its face value and interest. Its purchase thereof was made by its treasurer, with the approval of its president J. C. Adderly, pursuant to a resolution of its board of directors adopted October 21, 1925. The bank refused to pay the certificate and the Insurance Company brought suit to recover thereon. The defense of the bank was that it was induced to purchase the bonds for which the certificate was given by false representation as to the status of a fund to secure them. If the fraud complained of had been committed, J. C. Adderly knew of it. The question in the case was whether the Insurance Company, of which J. C. Adderly was president, and with whose approval it purchased the certificate, was chargeable with Adderly's knowledge of the fraud. It was held that it was not. It was so held on two grounds. It was to Adderly's interest to conceal the fraud from plaintiff. The knowledge of the fraud had been acquired when he was not acting for plaintiff. The court said [39 F.2d 402]: "If notice is charged to plaintiff, it must be through the undoubted knowledge that its president Adderly had of any such fraud at the time he participated in the purchase of the certificate of deposit by the plaintiff from his company, at least to the extent of approving it. Knowledge of an agent is ordinarily notice to his principal. The exceptions to this general rule are twofold. When the interest of the agent is adverse to that of his principal in such a way as that the agent will be presumed to conceal his knowledge from his principal and not to disclose it to him, the rule does not apply. Also, when the knowledge of the agent is not acquired while acting in the course of his employment for his principal, it does not bind the principal. The principal is not chargeable with notice of facts within the knowledge of his agent, when the latter acquired such knowledge while acting as agent for another. The two exceptions are so well settled as not to require citation of authority."

The principles thus laid down were applied in these words: "Adderly's interest in the transaction of the sale of the

certificate of deposit to plaintiff was adverse to it. If he knew his title to the investment was infected by its fraudulent acquisition it was to his interest to conceal this knowledge from the plaintiff, since disclosing it would defeat a sale of the instrument to plaintiff, which Adderly desired to make for his company. It would be presumed, and the fact was, that he would make no disclosure of the fraudulent acquisition of the instrument by him to the plaintiff, though he was its president, since this would defeat his attempt to sell it to plaintiff. Again, the knowledge that Adderly acquired of the fraud was acquired while he was acting as president of the Adderly Company, which owned and sold the bonds to defendant, and not as president of plaintiff, which had no connection with or interest in the sale of the bonds. The connection of the plaintiff first began when it subsequently sought to purchase the certificate of deposit from the Adderly Company. At that time the fraud had been already completed, and the knowledge of Adderly already fully acquired. As president of plaintiff, acting for it, he acquired no knowledge of the fraud. The knowledge acquired by him in acting for the Adderly Company alone did not bind the plaintiff."

It is open here to say that the plaintiff is not chargeable with Rogers Caldwell's knowledge of the existence of the side agreement on this latter ground also. When he acquired that knowledge he was not acting for plaintiff. He was acting solely and alone for Caldwell & Co. When he acted for plaintiff in the purchase of the certificates he had fully acquired knowledge of that agreement. He did not acquire it when acting for plaintiff in the purchase of it. It is not possible for a precedent to be more aptly in point here than the decision in this case.

As against these two decisions supporting plaintiff's position the defendant relies mainly on the decision in the case of Curtis, Collins & Holbrook Co. v. United States, which has already been fully considered and shown not to be in point. The defendant cites and relies on a number of other decisions. Of these he emphasizes the case of Title Guarantee & Trust Co. v. Pam, supra, I do not have access to this case and am dependent on quotations from the opinion therein. According to them it is not in point. It was claimed that the Guarantee & Trust Co. was not affected with the knowledge which the officers had in regard to the validity of the note discounted by it, because they had an interest to conceal such knowledge from the company. Seemingly the position was that it was not so chargeable because they had acquired the knowledge in another transaction. It presented the second of the two questions dealt with and decided in the case of Ohio Miller's Mutual Insurance Co. v. Artesia State Bank, heretofore considered. This decision seems to place a qualification on the position there taken. The court said: "If there was notice to the finance committee, the inference is permissible that there was notice to the plaintiff. Mr. Kelsey and Mr. Stanley, who were present at the meeting of the committee, were also officers of the plaintiff, and as such attended to the discount. They do not charge the corporation with knowledge merely because they were its officers. * * * They charge it because they were its officers, employed in the very transaction of the purchase of the paper, with a duty thus imposed on them to use whatever knowledge they had for the good of their employer. In such circumstances, it is not material that their knowledge was acquired while acting for another, as long as while acting for the plaintiff the facts were present in their minds."

I took notice of this same qualification in the case of Lawson v. Twin City Fire Ins. Co., D.C., 2 F.Supp. 171, 173. I there said: "But it cannot be said that the defendant had knowledge as to the true ownership of the property at the time it issued the policy. The claim that it then had such knowledge is based on the fact that Chesney, vice-president of J. L. Manring & Co., defendant's agent, in the issuing of the policy, acquired such knowledge, when acting as an official of the People's Building & Loan Association, on making the loan and obtaining the mortgage to secure it on February 12, 1930, nearly two months previous. Defendant is not chargeable with such knowledge. It was not acquired in acting for the defendant but in acting for such association. Union National Bank v. German Ins. Co. [7 Cir.], 71 F. 473. At least, it was not so chargeable unless it was established that Chesney, when the policy was issued, had the knowledge so acquired then in mind. Foreman v. German Alliance Ins. Ass'n, 104 Va. 694, 52 S.E. 337, 3 L.R.A.,N. S., 444, 113 Am.St.Rep. 1071."

The defendant also stresses the decisions in the cases of Pensacola State Bank v. Thornberry, 6 Cir., 226 F. 611; Kean v. Na-

tional City Bank, 6 Cir., 294 F. 214. But I find nothing in them against the position I have taken and I do not feel called on to notice them further.

After this survey of the authorities bearing on the question under consideration, cited pro and con, it is in order to state what I gather from them as to the law bearing on the subject of charging a principal with knowledge of his agent. If the agent acquires knowledge, whilst acting as agent and within the scope of his employment the principal is chargeable therewith, even though it may be to the interest of the agent to conceal it from him. The ground upon which this is so, as stated in 2 Mechem on Agency, 2nd Edit., Sec. 1805, is that "the agent while keeping within the scope of his authority, is as to the matters embraced within it, for the time being the principal himself, or at all events the alter ego of the principal, the principal's other self."

It follows, as stated in that work, that "Whatever knowledge or notice, then, reaches the agent during this time and under these circumstances, in law reaches the principal, whether it does so in fact or not."

But where the knowledge was acquired by the agent whilst not so acting, and previous thereto, the principal is not chargeable with such knowledge, at least if the circumstances are not such that it can be said that he had it in mind whilst so acting. In no contingency, however, is he chargeable therewith, if it was to the interest of the agent to conceal it from him.

So far I have limited the consideration to the knowledge of Rogers Caldwell. Arnett had actual knowledge of the side agreement the same as he did. It was not claimed that his father James E. Caldwell had actual knowledge thereof. But, assuming that he did, so that three members of the executive committee had such knowledge. It makes no difference. The three were all in the same boat. Arnett and James E. Caldwell's interests were adverse to plaintiff's the same as Rogers Caldwell. The defendant urges that the burden of proof was on plaintiff to prove that it purchased the certificates without notice of the side agreement. Conceding that this is so, it does not affect the decision of this case. The defendant in its answer alleged that plaintiff had notice thereof and in its statement of facts it undertook to set forth all the facts bearing on the question as to whether it had and claimed that according to them it did have notice. In view of this it is unimportant as to who had such burden. It appears from that statement that plaintiff did not have notice. Its burden is sustained thereby.

My conclusion, therefore, is that if there had been no substitution of certificates and this suit had been brought on the original certificates plaintiff would have been entitled to a decree.

 2. The other question in the case is, conceding that plaintiff would not have been entitled to a decree on the original certificates, does it follow that it is not entitled thereto on the substituted certificates. It does not follow. In making the substitution the defendant waived the side agreement. Such waiver was not affected by the understanding which the bank officials had with Rogers Caldwell at the time of the substitution. He had no authority to act for plaintiff in the matter. His interest was antagonistic to that of plaintiff. And the agreement was oral. In 2 Williston on Contracts, Sec. 644, it is said: "A parol agreement that an instrument need not be paid, or need not be paid in a certain contingency or may be paid wholly or partly in merchandise or should not be sued on when due or shall be renewed, is also in violation of the parol evidence rule."

The petition for rehearing is overruled.