## GENERAL AMERICAN LIFE INS. CO. v. ANDERSON.

### No. E–694.

District Court, W. D. Kentucky, Louisville.

July 10, 1942.

William Marshall Bullitt, Leo T. Wolford, Francis T. Goheen, and Thomas W. Bullitt, all of Louisville, Ky., and Allen May and Powell B. McHaney, both of St. Louis, Mo., for plaintiff.

Frank E. Wood, Robert S. Marx, Milton H. Schmidt, and Harry Kasfir (of Nichols, Wood, Marx & Ginter), all of Cincinnati, Ohio, for defendant.

SWINFORD, District Judge.

The whole determination of this case rests upon the activities of one Rogers Caldwell, an investment and securities broker of Nashville, Tennessee. This man's life and activities in the financial world in the 1920's reads like a romance. He organized Caldwell & Company, a brokerage and investment company. He dominated and controlled this company. He organized The Bank of Tennessee, which was used as a part of his complex financial structure. He became recognized as a multi-millionaire financial wizard. The period of time in which he operated was one of great credit inflation and gave him a natural setting for his daring speculations and desires to grasp financial power and prestige. He acquired the identity of "the J. P. Morgan of the South", and his genius for gaining confidences and his play upon less gifted men's minds was unlimited. His appetite for power was insatiable. The manifestation of his genius and the ultimate end to which it came are best described in the words of Judge Simons of the Sixth Circuit Court of Appeals in the opinion reversing a former ruling of this court in this case.

"Rogers Caldwell was a broker and promoter operating on an extensive scale, and controlling through stock ownership, interlocking boards of directors, and dummies, a large number of important banking and insurance corporations. Among the companies dominated and controlled by Caldwell were Caldwell & Co., a brokerage corporation with offices in Nashville, Tennessee. The Associated Life Company, The Bank of Tennessee, said to be a bank in name only, without a banking house, vaults, or fixtures, and with no general banking business, the Inter-Southern Life Insurance Company, and other banks and insurance companies, including the Missouri State Life Insurance Company. For a number of years he had been shifting the funds of all these banks and companies among each other to avoid unfavorable reports of bank examiners and insurance commissioners. Through Caldwell & Co. he was selling the Missouri State Life a large share of the securities purchased by it, many of them doubtful in character and not legal investments under the laws of Missouri, where the company was chartered, and including many mortgages already in default.

"It would extend this opinion unduly to recite the whole story of his financial juggling and the irregular, if not illegal, operations of the several corporations unfolded in the opening statement of counsel. It is sufficient at this point to say that it is a tale of frenzied finance at its boldest and most reckless worst." A. M. Anderson, Receiver, etc., v. Missouri State Life Insurance Co., 6 Cir., 69 F.2d 794, 796.

Through the agencies and connections referred to large stock ownership was acquired by the Caldwell companies in the Missouri State Life Insurance Company. This was one of the largest insurance companies in the United States. Among the stock companies it was surpassed in size by only the Travelers and the Aetna, and was eighteenth in size of all life insurance companies in this country. It did business in forty-two states, employed about seven hundred persons and had investment departments in many of the large cities in America.

Its size and importance are reflected in the following table:

| | Capital and Surplus | Admitted Assets | Income |
|---|---|---|---|
| 1925 | $4,000,000 | $62,000,000 | $21,000,000 |
| 1926 | $5,000,000 | $70,000,000 | $23,000,000 |
| 1927 | $6,000,000 | $80,000,000 | $25,000,000 |
| 1928 | $7,000,000 | $131,000,000 | $72,000,000 |
| 1929 | $7,000,000 | $143,000,000 | $41,000,000 |
| 1930 | $7,000,000 | $151,000,000 | $40,000,000 |

| | Disbursements | Insurance in Force | Number of Policies |
|---|---|---|---|
| 1925 | $13,000,000 | $587,000,000 | 197,000 |
| 1926 | $14,000,000 | $600,000,000 | 200,000 |
| 1927 | $17,000,000 | $750,000,000 | 222,000 |
| 1928 | $23,000,000 | $1,000,000,000 | 364,000 |
| 1929 | $30,000,000 | $1,200,000,000 | 371,000 |
| 1930 | $32,000,000 | $1,250,000,000 | 371,000 |

Its directors at the time of the transactions here involved and for preceding years were business men of high standing, many of them connected with large and successful financial and business institutions entirely unrelated to any of the Caldwell interests. It had something like 4,000 stockholders. At the time of the transactions involved in this case the Caldwell interests owned about 30% of the capital stock and exercised the most powerful influence over the board of directors and all agencies of the company and its enterprises. The president of the Missouri State Life at this time was Hillsman Taylor, from

Tennessee, a protege of the Caldwells and largely dominated in his decisions and conduct of the affairs of the company by Rogers Caldwell, and his father, James E. Caldwell, who was also a member of the board of directors.

The directors named an Executive Committee from the members of its board with broad delegated powers to pass upon securities in which it invested. This committee was composed of Rogers Caldwell, James E. Caldwell, Hillsman Taylor and others more independent of Caldwell, but who rather generally accepted the judgment of the Caldwell group on investment of the funds of the company. Large blocks of securities were purchased from Caldwell & Company. It is also shown that investments were made through other firms to an even greater extent than through Caldwell & Company.

To sum up the evidence contained in hundreds of pages of transcript it is established that at the time of the transactions involved in this action Rogers Caldwell was the most dominant personality in the Missouri State Life organization and exercised influence to such an extent that the company submitted to his guidance and direction in its investment branch to a dangerous degree. The record, however, contains ample evidence that the board did not on all occasions comply with his will.

The immediate transaction with which we are concerned is the purchase of two certificates of deposit for $250,000 each, executed on August 21, 1930, by The National Bank of Kentucky, at Louisville, Kentucky.

The standing and financial solidity of The National Bank of Kentucky are too well known and too frequently · discussed in opinion from this court and others to be reviewed here. See Anderson v. Abbott et al., D.C., 32 F.Supp. 328; Atherton v. Anderson, 6 Cir., 86 F.2d 518; Anderson v. Abbott, 6 Cir., 127 F.2d 696.

As is pointed out in these authorities, it was considered an impregnable fortress of security and conservative banking. Its end as such an institution came about through the wild speculation, carelessness and corruption of some of its officers and the laxness and negligence of its board of directors. Atherton et al. v. Anderson, 6 Cir., 99 F.2d 883.

Rogers Caldwell controlled an insurance stockholding company known as The Associated Life Company. Through contact with James B. Brown, Executive President of The National Bank of Kentucky, and Charles F. Jones, its Vice-President, he · borrowed from the bank for the Associated Life Company the sum of $500,-000. These negotiations were had not at the bank, but at the home of James B. Brown, in Louisville. The loan was secured by collateral and a note duly executed to the bank by the Associated Life Company. The Associated Life then gave its check to the bank for the amount of the loan and the bank issued to Caldwell & Company the two certificates of deposit on which were reissued the certificates in suit. Simultaneously Caldwell & Company delivered to the bank a letter from Associated Life stating that it had purchased the certificates from the proceeds of the loan in the name of Caldwell & Company and in the letter incorporated this statement and obligation: "We hereby agree and guarantee that the certificates of deposit will not be cashed only in reduction of the above mentioned loan."

On August 27, 1930, six days after the certificates were issued, in violation of the agreement, Caldwell & Company sold and the Missouri State Life purchased one of the certificates for $250,000, its face value, and on the same day a letter was sent by the Missouri State Life to the bank calling attention to a bylaw of the company that all securities must stand in the name of the company and asking that the certificate be reissued in the name of the Missouri State Life. This letter is in words and figures as follows:

"August 27, 1930

"Mr. James B. Brown, President,
"National Bank of Kentucky
"Louisville, Kentucky,·

"Dear Mr. Brown:

"We today purchased the enclosed certificate of deposit for $250,000, bearing number A-67858, payable to Caldwell & Company, endorsed by them.

"In lieu of this certificate, we will appreciate your furnishing us with a new one, dated and due the same dates, bearing the same rate of interest, made payable to the order of the Missouri State Life Insurance Company.

"Also please furnish us with a letter, over the signature of an authorized officer in your bank, to the effect that upon maturity of the certificate the money will be returned to the Home Office of the

Company, in St. Louis, Missouri, without cost to us.

"Yours very truly,
"P. J. Raidt
"Assistant Cashier
Missouri State Life Ins. Co."

The bank did not immediately acknowledge the receipt of this letter but held the certificate until a second conference was had on the night of September 4, at the home of James B. Brown with Rogers Caldwell, who had returned to Louisville. There were present at this meeting Brown, Caldwell, Jones and also Mr. Heitzberg and Mr. Carter, employees of Caldwell & Company.

At this meeting transfer of the certificates of deposit was discussed and the letter from the Missouri State Life in that connection. Thereupon Mr. Caldwell assured Brown and Jones that the side agreement that the certificates would be used only to satisfy the note held by the bank would apply to the Missouri State Life with equal force and that there would be no obligation on the part of the bank to redeem them from the Missouri State Life on any other terms. In other words, Caldwell undertook to bind the Missouri State Life to the agreement made between the bank and Associated Life. It should be pointed out that no writing was had and that the certificates bore no evidence of this understanding.

The following day, September 5, a new certificate was issued and forwarded with the following letter to the insurance company in St. Louis:

"September 5th, 1930
"Mr. J. P. Raidt, Assistant Cashier
"Missouri State Life Insurance Co.,
"St. Louis, Mo.
"Dear Mr. Raidt:
"Your letter of August 27th, addressed to our President, Mr. James B. Brown, who has been out of town for a few days, has been handed to me for attention.

"We acknowledge receipt of certificate of deposit of $250,000.00 #A-67858, payable to Caldwell and Company, endorsed by them and dated August 21st, 1930.

"As instructed we are enclosing herewith certificate of deposit #A 67917 bearing the same date, August 21st, 1930, for $250,-000.00, payable to the Missouri State Life Insurance Company.

"Very respectfully yours,
"C. F. Jones
"Vice-President."

On the same day a second letter had issued from the insurance office which is as follows:

"September 5, 1930
"Mr. James B. Brown, President
"National Bank of Kentucky
"Louisville, Kentucky
"Dear Mr. Brown:
"We are wondering why we have not received the certificate of deposit for $250,000, in lieu of the one sent you, payable to Caldwell & Company, endorsed by them on August 27.

"Sufficient time seems to have elapsed to permit you to favor us with this certificate. Please forward it to us at once.

"Also please state over the signature of an authorized officer of your bank that the money covering the certificate of deposit will be sent to this office without cost when presented for payment on this maturity date.

"Sincerely yours,
"P. J. Raidt
"Assistant Cashier."

Missouri State Life purchased the second certificate on September 13, and forwarded it immediately to the bank to reissue. The bank reissued the certificate and sent it to the insurance company with the following letter on September 16:

"Mr. Charles H. Hempel, Cashier
"Missouri State Life Insurance Co.
"St. Louis, Mo.
"Dear Mr. Hempel:
"We have your letter of September 13th enclosing certificate of deposit No. A 67857 for $250,000.00 payable to Caldwell & Company and endorsed by them.

"As requested, we are issuing in lieu of this certificate a new certificate of deposit No. A 67960 dated August 1, 1930, for $250,000.00 payable to your order.

"Respectfully yours,
"C. F. Jones,
"Vice-President."

On September 19 the Executive Committee of the insurance company approved the purchase of the certificates by proper minutes on the record of the company.

On September 23 the company again wrote the Bank as follows:

"Mr. Charles F. Jones, Vice-President
"National Bank of Kentucky
"Louisville, Ky.
"Dear Mr. Jones:
"We hold certificates of deposit Nos. A-67917 and A-67960, for $250,000 each,

issued by the National Bank of Kentucky to the Missouri State Life Insurance Company.

"At the time these certificates were obtained, we asked you to furnish us with letters, over the signature of an authorized officer in your bank, to the effect that upon their maturity the money would be returned to the Home Office of the Company, in St. Louis, Missouri, without cost to us.

"Won't you please comply with our request in order that our records may be complete?

"Yours very truly,
"Charles H. Hempel
"Cashier."

The bank replied on October 1:

"Mr. Charles H. Hempel, Cashier,
"Missouri State Life Insurance Co.,
"St. Louis, Mo.

"Dear Mr. Hempel:

"Answering your letter with reference to certificates of deposit Nos. A-67917 and A-67960 for $250,000.00 each, issued by us to the order of the Missouri State Life Insurance Company, wish to advise that when these certificates are paid the money will be remitted to the Home Office of your Company in St. Louis, Mo., without cost to you.

"Very respectfully yours,
"C. F. Jones,
"Vice-President."

In this extended correspondence no mention was ever made by the bank that the certificates were limited in their payment or that they were other than the negotiable instruments they purported upon their face to be. There is nothing in the record to show that the insurance company ever had notice of the agreement.

A portion of the testimony of Mr. Hempel in this respect, as it appears on page 254 of the Transcript, is as follows:

"179. (The Court) In the usual course of the business of your company, would all communications pertaining to these certificates of deposit come to you from the National Bank of Kentucky? A. Yes, sir.

"180. As far as you know, you had in your possession every communication that came from the Bank of Kentucky about the certificates of deposit? A. Yes.

"181. Did any of these communications at any time refer to any agreement had with Mr. Rogers Caldwell on behalf of the defendant?" (Evidently meant plaintiff) "A. No, sir.

"182. Did any of them at any time refer to Mr. Rogers Caldwell having been in Louisville and talked to the officers of the National Bank of Kentucky at any time? A. No, sir.

"183. Did any communication you sent to them make any reference to Mr. Rogers Caldwell in reference to this transaction? A. No, sir.

"184. (Mr. McHaney resumes) When was the first time that you as an officer of the Missouri State Life and as Cashier of that Company, ever heard it said that Mr. Caldwell had agreed that the certificates of deposit which you had purchased would not be used except to retire an indebtedness of the Associated Life, or any other oral agreement made by Rogers Caldwell? Objected to as immaterial, and the objection is overruled, to which counsel for defendant excepts. A. That was, as nearly as I can recall, around April 7, 1931.

"185. And was that when you were dealing with the Receiver of the National Bank of Kentucky? A. Yes, sir."

When the bank went into receivership claim was made for their collection and denied by the receiver. Action was brought to compel payment to the insurance company of a 67% dividend as had been awarded other creditors. When the case was called for trial the late A. M. J. Cochran, Judge of the District Court for the Eastern District of Kentucky, sitting by designation in Louisville, gave judgment for the plaintiff upon the opening statement of counsel. 46 F.Supp. 181.

Upon appeal the case was reversed and remanded for trial. 69 F.2d 794.

The decision of the Court of Appeals that the case should be reversed is based primarily on the following statement in its opinion [page 798]:

"Nor do we see here any escape from the 'sole actor' doctrine even in the limited application that was made of it by this court in the third phase of Kean v. National City Bank [6 Cir.], 294 F. 214, and by the Supreme Court in Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956. When members of a board or committee representing a corporation surrender their powers to an individual, either within or without such board or committee, who completely dominates, and through whom only the corporate powers are exercised, such board or committee is the sole actor, with but a single will and

purpose, or else the dominant individual is the sole actor, and the others are to be ignored as if they did not in fact, as they do not functionally, exist. However, considered, the principle is the same. So applying the sole actor doctrine, we cannot distinguish this case either from the third phase of the Kean case, supra, or from the holdings of this court in National City Bank v. Carter·[6 Cir.], 14 F.2d 940, and National City Bank v. Carter [6 Cir.], 31 F.2d 25. Moreover, the question of exclusive control is one of fact upon all the evidence, and the amount of stock owned by Caldwell is, on that issue, not at all conclusive."

After a full and complete hearing in which about twenty witnesses testified and having gotten first hand the full benefit of their intepretation of the events surrounding this transaction, I am convinced that the plaintiff should recover and that any other decision, tested by the rules of law set forth in the opinion reversing this case, would be a gross miscarriage of justice. It would enable the bank, whose officers assisted either wittingly or unwittingly, to perpetrate a fraud to enrich itself at the expense of innocent creditors and policyholders.

■ It must be borne in mind that there is a clear distinction between exercising domination or absolute control over the affairs of a corporation and in being the alter ego of the corporation. A person may be able to have the corporation do its bidding, this is not unusual where a majority of the stock is owned or controlled, but the ability to make a corporation perform in a certain way does not automatically obviate the necessity of first having its record authorize the commitment.

On the other hand, to be sole actor is to deal on behalf of the corporation with one who believes that the corporate will is completely subjugated to the will of the sole actor. To so hold in this case is to shut the court's eyes to the real facts. The proof is abundant that Rogers Caldwell was powerful in the affairs of the Missouri State Life, so powerful that he exploited its assets, but it would be vain to say that there is proof that James B. Brown, representing the National Bank of Kentucky, believed that Caldwell was the alter ego of the insurance company. The record shows that prior to this time Rogers Caldwell had endeavored to have Brown elected to the board of directors and had failed. He was much in

earnest in this desire as it caused a breach between him and other directors who defeated Brown's selection. Brown had been apprised of this stinging rebuke. Rogers Caldwell had asked Hillsman Taylor to · write Brown and congratulate him on his being elected. Thereafter Brown's name was proposed but he was defeated and another (Arnett) named in his stead.

Brown and his bank were a tool in Caldwell's hands who apparently could get whatever he wanted through them. It would be equally as reasonable to say that he could commit the National Bank of Kentucky or could assume for it the role of "sole actor".

To sustain the defense in this case would be to ignore tested and time honored rules of law, tempered by fair and reasonable constructions and to invoke a doubtful and somewhat weak "doctrine" and thereby foist upon helpless policyholders a legal swindle.

■ This so-called sole actor doctrine is not a doctrine at all. It is a principle of equity which relieves from the rigors of or enforces a binding contract for a party who has dealt with an individual believing the individual had authority to speak for the corporation and to commit it to the obligation. It is invoked solely for the purpose of doing equity, and he who relies on it must come into court with clean hands. If Rogers Caldwell was the Missouri State Life, to be inferred only from his domination of the conduct of its affairs, it might be urged with equal force that he was also the National Bank of Kentucky as he dominated with equal success its affairs through its president and executive officers permitted by its stockholders to commit it on obligations and contracts.

To permit all the rules of law and evidence to be set aside, in the name of equity, against a private corporation should be followed only in rare cases. But to resort to this so-called sole actor principle against an insurance company or a bank where innocent policyholders' and depositors' rights are directly affected should be even rarer.

The sole actor doctrine can be expanded too far and applied so loosely that its worthy purpose is lost. Rogers Caldwell might have been dominant enough to have had the board do his bidding. A great many, if not a majority, of corporations, both great and small, are controlled by some one personality. There is a vast difference between controlling the corporate will and bodily supplanting the corporation.

The proof falls far short of convincing this court that the third largest stock insurance company in America, with assets of $151,000,000, with contracts obligating it to thousands of policyholders, their widows and orphan children, with a board of directors composed of men whose character nor ability has ever been subjected to attack is bound by a verbal statement of a minority stockholder, no matter how powerful or dominant, to the extent of half a million dollars. Nor can it sustain this fraud upon a principle of equity.

The proof must be preponderant that the management and control of the affairs of the corporation have been abdicated to such an extent that those dealing with its active manager were deceived into believing that his authority was supreme.

The difficulty would have been avoided had the representatives of the defendant verified by letter, wire or phone call this statement by Caldwell, whom they knew was only a minority stockholder in a very large insurance company. He who keeps silent when he should have spoken will not be heard to speak when he should keep silent.

This whole transaction was a fraud on its face to which the bank was a willing partner and instrument. No explanation is given and indeed none can be had to the bank's releasing these certificates, valid on their face, into the channels of trade, except to enable Caldwell to present to the business world an absolutely false credit. Brown, president, and Jones, vice-president, knew that these certificates were void for any legitimate purpose. That no possible legitimate use could be made of them. The bank corresponded with the insurance company concerning them but made no revelation concerning the secret equities attached to them. On the contrary, committed the bank to send to the insurance company the money when due without discount or a handling charge.

█ In the case of Federal Deposit Insurance Corporation v. Pendleton, D.C., 29 F.Supp. 779, 782, this court said:

"The sole actor doctrine is based on a presumption. That is that by reason of the relationship between an agent and his principal the principal is presumed to have been told everything the agent has done and presumed to have condoned all his actions and promises.

"This is the category of legal reasoning in which Mr. Justice Taft places it, while sitting as Judge in the Sixth Circuit Court of Appeals. In the case of Thomson-Houston Electric Co. v. Capitol Electric Co., 65 F. 341, 343, the court speaking through Mr. Taft said: 'As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him. In re Distilled Spirits, 11 Wall. 356, (20 L.Ed. 167). This rule is said to be "based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty." Such a presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud the principal. The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it.' "

Obviously the whole scheme could result in no benefit to the Missouri State Life, but was only depleting its assets with no hope of return. The entire good faith of the insurance company is revealed in the correspondence. Counsel for the defendant says that may be true but it cannot be considered because it took place after the transaction and purchase of the certificates.

Only one of the certificates had been purchased at the beginning of the correspondence. Had the secret agreement been revealed then the company could certainly have had the benefit of that knowledge at the time Caldwell & Company offered to sell the second certificate. There was ample opportunity for the insurance company to proceed to enforce retraction of the sale of the first certificate and subject the collateral to a retirement of the debt while the collateral had value. At any rate, it does not behoove the bank now asserting an equitable defense to admit the fraud and its unpardonable and inexplicable part in it, to cry, "too late."

█ Again I quote from the Pendleton case from this court: "The sole actor doctrine contemplates that the agent must have ostensibly at least endeavored to benefit his principal and even though he did not do so and his acts were for his personal benefit, possibly through defalcation, the third party who had obligated himself must

have been under the impression that he was dealing with the principal. In other words, if the proof shows that the third party was dealing with the agent for what he believed to be the benefit of the principal, even though it may not have in fact been for the principal, the principal is bound by the knowledge of the agent. But, if the facts show that through all the dealings the third party knew or must have known by the very nature of the transaction that the principal could not have had knowledge of what was taking place he cannot be heard to charge the principal with knowledge. Munroe v. Harriman et al., 2 Cir., 85 F.2d 493, 111 A.L.R. 657."

In the case of Kean v. National City Bank, 6 Cir., 294 F. 214, 221, there is an extended discussion and review of what it terms "the so-called 'sole actor' cases."

In addition to the idea of presumption of knowledge some courts place the theory upon the legal identity of principal and agent. The Kean case quotes, with approval, the following rule from Mechem on Agency:

"Another general theory advanced to sustain the proposition that the principal is charged with notice to the agent—

" 'finds the reason of the rule in the legal identity of the agent with the principal, during the continuance of the agency, in the fact that the agent, while keeping within the scope of his authority, is as to the matters embraced within it, for the time being the principal himself, or, at all events the alter ego of the principal, the principal's other self. * * * Whatever notice or knowledge, then, reaches the agent during this time and under these circumstances, in law reaches the principal, whether it does so in fact or not.' 2 Mechem on Agency (2d Ed.) § 1805."

In another part of the opinion the court says: "Unquestionably the general rule is that notice to the agent as to any transaction within the scope of his authority is to be considered as notice to the principal. This rule is most frequently said to be 'based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty.' [In re] Distilled Spirits, 11 Wall. [356], 367, 20 L.Ed. 167. There is, however, a well-established exception to the operation of this general rule, wherever the agent is shown to have been engaged in a private enterprise for the purpose of defrauding the principal or others. Then it is said that it cannot be presumed that the agent will communicate to the principal the facts which would convict the agent of an attempt to deceive and defraud the principal. Thomson-Houston Electric Co. v. Capitol Electric Co. [6 Cir.], 65 F. [341], 343, 12 C.C.A. 643."

In the case of Federal Deposit Insurance Corporation v. Vest, 6 Cir., 122 F.2d 765, one T. O. Morton was the president and chief executive officer of the Taylor National Bank, Campbellsville, Kentucky. He had Vest sign a note for $10,000 to the bank on the promise that it would never have to be paid, but was merely an accommodation. Morton used the money for his own personal advantage. The receiver of the bank sued Vest. The lower court found "that at all times referred to, Morton was not only the president and chief executive officer, but owned 76% of the capital stock of the Taylor National Bank and was in exclusive control of the Bank and directed all of its operations; that he exercised the corporate will of the Bank in all matters, and the acts of all other officers were merely perfunctory; that he dominated the Board of Directors and the Loan Committee of said Bank; that The Taylor National Bank was a typical 'one man bank.' "

The lower court denied recovery on the ground that Morton as "sole actor" of the bank by permission and acquiescence of its directors had authority to make the commitment and the bank was bound by that commitment.

On appeal the Circuit Court of Appeals for the Sixth Circuit in its opinion adopted the above-quoted finding, reversed the case and held that the bank should recover. The court declined to discuss the "sole actor" phase of the case but rested its conclusions on the opinion by the Supreme Court construing the National Banking Act in Deitrick v. Greaney, 309 U.S. 190, 60 S.Ct. 480, 483, 84 L.Ed. 694.

The facts in the Vest case are infinitely stronger than in the present case and even though the issue of "sole actor" is not decided the reasoning and deductions in the Greaney case apply with equal force to the case at bar. As is said in the Greaney case: "It is a principle of the widest application that equity will not permit one to rely on his own wrongful act, as against those affected by it but who have not par-

ticipated in it, to support his own asserted legal title or to defeat a remedy which except for his misconduct would not be available. See United States v. Dunn, 268 U.S. 121, 133, 45 S.Ct. 451, 454, 69 L.Ed. 876, Independent Coal & Coke Co. v. United States, 274 U.S. 640, 648, 47 S.Ct. 714, 717, 71 L.Ed. 1270. Applied in cases like the present, the rule that the illegal agreement may not be set up to defeat the obligation of the note is sometimes denominated an equitable estoppel."

■ A distinction should be made between a private corporation and a bank or insurance company in the application of the sole actor principle. A private corporation is responsible to its stockholders only. There is no representative of the state or federal government that can close it. If its stockholders elect directors who permit one person to assume to speak for the company, they alone will suffer if the sole actor obligates them to contracts. With a bank or insurance company the situation is different. The people making deposits and writing policies of insurance have the understanding that the books of that corporation are to be examined periodically by a representative whom the people are through their government agencies employing. This agent a bank examiner or insurance commissioner, has the duty and authority to close that corporation if it cannot sustain its commitments to the public with which it is dealing. Where it remains open and people patronize it believing it is sound by reason of government inspection, courts should be slow to bind it for the unauthorized acts and secret agreements, not reflected by its books, of its agents and officers.

The whole structure of such corporations is based upon the invitation to do business with them because they cannot do business at all without the consent of the people (government). The inspection rests solely upon the records and if those records are false not only stockholders and creditors, but wholly innocent persons, are defrauded.

The "so called" sole actor "doctrine" should rarely, if ever, be applied to such institutions.

■ In the light of all the facts I am of the opinion that the plaintiff should recover. No interest will be allowed.

Proper findings of fact, conclusions of law and judgment in accordance with this opinion will be submitted.