**SEABOARD SURETY CO. v. SPEAR et al.**

Nos. 8649, 8650.

Circuit Court of Appeals, Sixth Circuit.

May 15, 1941.

E. Dean Alexander, of Detroit, Mich. (Alexander, McCaslin & Cholette, of Detroit, Mich., on the brief), for appellant and cross-appellee Seaboard Surety Co.

George C. Quinnell, of Marquette, Mich., for appellees and cross-appellants Spear et al.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Plaintiffs below, and herein called plaintiffs, supplied lumber and materials to Arthur Storm Company, a Michigan corporation, herein called Storm, which contracted with the Government for the construction of certain buildings at four conservation camps in the State of Michigan. At the same time (1934) Storm had contracts with the Government for similar work at two camps in Illinois. Defendant, Seaboard Surety Company, herein called surety, was surety on the usual performance bonds furnished by Storm under the Hurd Act, 40 U. S.C.A. § 270, for each of the six jobs.

Final settlements under the Act were effective on October 15, 1934. Plaintiffs brought, or intervened in, two separate suits at law upon the bonds. The first was voluntarily dismissed on April 7, 1936, on the mistaken belief, that at the time it was instituted, settlement had not been made. The second, commenced April 13, 1936, was held by this court to have been brought too late. United States, for Use and Benefit of F. B. Spear & Sons, v. Arthur Storm Co., 6 Cir., 101 F.2d 524.

This suit in equity was commenced on November 26, 1935, and was held in abeyance until the determination of the second suit at law. It was brought against the surety to reach certain sums paid to it by the Government on the contracts, the contractor having executed a power of attorney to the surety authorizing it to receive, endorse and collect checks drawn on the Treasury of the United States and to give full discharge for the same. The Dis-

trict Court found that the surety took the payments for the purpose of indemnifying itself but held that the plaintiffs had an equitable lien to the extent of their claims on all sums paid with respect to the four Michigan camps and entered a judgment against the surety for the amount of their claims.

The surety company appealed, and in addition to its defense upon the main cause of action, insisted that plaintiffs had an adequate remedy at law. Plaintiffs brought a cross appeal from that part of the decree which denied interest upon the amount of their recovery.

The character of plaintiffs' claims as to each camp, the contract price, the amounts allocated to each camp by the Government in the settlement, and the amounts of the bonds upon each, are set forth in the following table:

plied to the Michigan camps. On November 8, 1935, the surety paid the Currier Company $11,500 from the special account in full discharge of its claims. This payment was made in a roundabout manner. On November 5, 1935, the National Bank of Detroit issued a check for $11,500 from funds wired to it from the special account above indicated. The check was payable to A. Kurzman, Secretary to the surety's attorney in Detroit, and was endorsed by her to the order of the Currier Company.

As pointed out above, the major part of the Currier Company claim was for materials supplied to the Illinois camps. The Government's allocation for all work at the Illinois camps was but $4,377.33. Hence, in paying the Currier Company $11,500 from funds received in the settlement, the surety was clearly taking money, that had been earmarked by the Government for the

## MICHIGAN

| Camp | Claims | Cont. Price | Settlement | Bond |
|---|---|---|---|---|
| Goodar | $ 248.49 | $ 1,974.00 | $ 1,674.00 | $ 1,000.00 |
| James Lake | 3,791.63 | 4,000.00 | 3,800.00 | 2,200.00 |
| Kenton | 1,295.81 | 2,200.00 | 1,620.00 | 1,100.00 |
| Newberry | 3,115.71 | 3,950.00 | 3,550.00 | 1,975.00 |
| Total | $8,451.64 | $12,124.00 | $10,644.00 | $ 6,275.00 |

## ILLINOIS

| Camp | Cont. Price | Settlement | Bond |
|---|---|---|---|
| Havana | $17,761.44 ⎱ | | $ 8,850.00 |
| Pittsfield | 18,381.44 ⎰ | $ 4,377.53 | 8,950.00 |
| Total | $36,142.88 | $ 4,377.53 | $17,800.00 |

The Government deducted from the amount of the settlement certain penalties for delays in completion of the work at the Michigan camps. It completed the Illinois camps itself. Pursuant to an authorization from the contractor to the Quartermaster dated September 19, 1934, settlement check was ordered sent to the surety at its Detroit office but on October 21, 1935, it was actually sent to the contractor, care of the surety at its New York office. The settlement totalled $15,021.53 for all claims of which the sum of $10,644 was allocated to the Michigan camps. The surety set up the amount of the settlement in a special account.

The Currier Lumber Company supplied materials in the amount of $19,264.01 of which only $2,283.49 in amount was sup-

Michigan camps, to discharge Illinois claims.

Plaintiffs sought by their bill to have the funds received by the surety on account of each camp paid to the creditors thereof and to no other creditor of the Storm Company. The surety answered that the Currier Company settlement was made at the request of the contractor and argued in its brief and here that it was the right of the contractor to apply payments in any manner it saw fit.

The court found that the surety took possession of the funds for the purpose of indemnifying itself and the evidence sustains the finding. The contractor was undoubtedly insolvent and the court so found. It failed to pay its annual franchise fee in 1934 and 1935, and its attorneys wrote

counsel for plaintiffs on October 30, 1935, that it had practically gone broke and that if any money was paid it would have to come from the bonding company. The surety obtained the power of attorney above indicated on September 22, 1934, "to receive, endorse and collect for and on behalf of the corporation any checks drawn on the Treasurer of the United States and to give full discharge therefor."

This power of attorney gave the surety full control of the contractor's money. It is true that there was evidence that the contractor negotiated the Currier Company settlement and requested its payment, but on November 7 (apparently 1935) surety's attorney wrote plaintiffs' attorney that the money it received "is used for the purpose of indemnifying itself against the liability that it has on its bonds and these bonds total about $25,000.00."

But only $4,377.53 of the Government's settlement was allocable to the Illinois contracts, and when the surety paid $11,750 to the Currier Company from that fund the difference between $11,750 and $4,377.53, or $7,372.47, was necessarily made up from the Michigan camp moneys. Since the surety was not liable on its bonds (U. S. v. Storm, supra), by depleting the Michigan moneys by $7,372.47, it virtually wiped out its liability to that extent on the Michigan contracts. Thus, on the surety's theory of the case, that it could disburse the settlement moneys at will, it reduced its liability on the Michigan contracts from the $10,644 allocated thereon, to $3,371.53, the balance left in the fund. In making the Currier Company settlement in the manner it did, the surety was clearly controlling payments to its own advantage.

■ The crux of the controversy is, whether, as between plaintiffs and the surety, the plaintiffs, as claimants, were entitled to an equitable lien upon that part of the settlement which came into the hands of the surety in payment for work and materials at the Michigan camps. We think that they were and that this is true regardless of whether their right should be denominated as an equitable lien or an improver's or material man's lien, or a right to priority payment, as. between the plaintiffs and the paid surety. In American Surety Co. of New York v. Westinghouse Electric Mfg. Co., 296 U.S. 133, 56 S.Ct. 9, 80 L.Ed. 105, the contractor became bankrupt and the fund was paid over by the Government to the Trustee. The controversy was solely between the material men and the laborers on one side and the surety on the other, the latter having received a covenant of indemnity from the contractor at the beginning of the work. The court reasoned that where the bond has been given under the statute, equity forbids that the statutory security be whittled down indirectly by any promise of indemnity, general or specific; that debtor and surety may not agree that the material men and laborers shall have less of the general assets as the price of their right to recover on the bond and that, through the bond and the statutes, a new relation had been established with a new set of equities, and that the funds due the contractor are not subject to distribution at the pleasure of the principal. See also Belknap Hardware & Mfg. Co. et al. v. Ohio River Contract Co., 6 Cir., 271 F. 144.

In Jenkins v. National Surety Co., 277 U.S. 258, 48 S.Ct. 445, 72 L.Ed. 874, it was held that a surety may not share in the assets of the principal until debts partially protected by the bond have been satisfied in full. Obviously this statute-given equity of the suppliers to moneys due upon the contract is not lost where the surety obtains possession by scheming with the contractor, since it has not discharged in full the condition of its bond. Nor would the equitable right against the surety be lost through disbursement of the money to a claimant upon an entirely different contract (the Illinois) since the statute operates in conjunction with each separate bond to create a particular equity in the moneys payable in relation to the contract for which the bond was given. In the hands of the surety, out to indemnify itself, the equities in a particular fund arising by statute in conjunction with the bonds given in connection with the Michigan camps must not be confused, nor lumped, with the equities originating in the bonds given in connection with the Illinois camps.

Plaintiffs are entitled to a lien upon the fund remaining in the surety's possession in the special account, and by reason of the conversion by the surety as above indicated, they are entitled to an affirmance of the decree of the District Court.

■ Plaintiffs did not have an adequate remedy at law. The machinery of the law is not suited to the enforcement of equitable liens. Moreover, the tabulation discloses that plaintiffs' claims arising from the construction of Camps Newberry, Kenton and James Lake exceed, in each instance, the

amount of the bond, so that action on the bonds, even if timely, under the Hurd Act, would not have afforded them complete relief.

■ *As to plaintiffs' cross appeal:* We have pointed out that the prosecution of the case was delayed pending the outcome of the suit at law. Plaintiffs, with alternative remedies, elected to pursue, first, the one at law. The court held that this was plaintiffs' delay and refused interest. The allowance of interest in a suit at equity is within the court's discretion and will not be disturbed except for clear abuse [Robertson v. Miller, 2 Cir., 286 F. 503] which we do not find to exist here.

Decree affirmed.