**ANDERSON v. GENERAL AMERICAN LIFE INS. CO.**

**GENERAL AMERICAN LIFE INS. CO. v. ANDERSON.**

Nos. 9547, 9546.

Circuit Court of Appeals, Sixth Circuit.

April 7, 1944.

Wm. Marshall Bullitt, of Louisville, Ky. (Wm. Marshall Bullitt, Francis T. Goheen, and Thomas W. Bullitt, all of Louisville, Ky., Powell B. McHaney, of St. Louis, Mo., and Bullitt & Middleton, of Louisville, Ky., on the brief), for General American Life Ins. Co.

Robert S. Marx, of Cincinnati, Ohio (Robert S. Marx, Frank E. Wood, Harry Kasfir, and Nichols, Wood, Marx & Ginter, all of Cincinnati, Ohio, on the brief), for Anderson, receiver.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

This is the second appeal by the Receiver of the National Bank of Kentucky (in liquidation under the National Banking Act, 12 U.S.C.A. § 21 et seq.) from adverse judgment in the district court, upon a cause of action brought by an insurance company to enforce payment to it, as holder of two certificates of deposit issued by the bank for $250,000 each, of the same pro rata dividends which have been distributed to other creditors of the bank. There is also to be considered the cross-appeal of the General American Life Insurance Company from the disallowance of interest—a quite important issue, on account of the amount involved.

Upon the former hearing of the case, it appeared that, following the opening statement of defenses made by the attorney for the Receiver into which he incorporated the averments of the answer, and without receiving any evidence whatever, the district judge awarded the plaintiff insurance company judgment for the full amount of its claim, with interest, and ordered payment of the pro rata dividends on the claim. The reasons for his action were detailed by District Judge Cochran on petition for rehearing. Missouri State Life Ins. Co. v. Keyes, D.C.W.D.Ky., 46 F.Supp. 181. This court reversed the judgment of the district court and directed that evidence should be received and that findings of fact and conclusions of law should be filed by the district court. The assumed facts and the rationale upon which reversal was based are reported in Anderson v. Missouri State Life Ins. Co., 6 Cir., 69 F.2d 794.

By purchase of the assets of the Missouri State Life Insurance Company, in state insolvency proceedings, the present appellee, General American Life Insurance Company, became vested with title to the original plaintiff's claim against the Receiver and, by order of the district court, has become substituted plaintiff herein.

The opinion of District Judge Swinford, who tried the case upon its remand, is reported in General American Life Ins. Co. v. Anderson, D.C., 46 F.Supp. 189-198.

On the former hearing of the case, no error was found in the conclusion of District Judge Cochran that the knowledge of Rogers Caldwell of the infirmity which attached to the original certificates of deposit issued to Caldwell & Company was not attributable to the Missouri State Life Insurance Company, inasmuch as Caldwell had acquired such knowledge while acting for himself, or for Caldwell & Company, and not for the insurance company; wherefore, it was to his interest to conceal such knowledge, rather than to reveal it to the insurance company, which subsequently purchased the certificates and caused them to be reissued directly in its own corporate name. This conclusion was considered to be supported under the familiar rule of agency that it would be presumed that, in such circumstances, an agent would not communicate his knowledge to his principal; and that, therefore, the Missouri State Life Insurance Company was not chargeable with knowledge of the written agreement between the bank and the Associated Life Companies, Inc. American National Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310; Ohio Millers' Mutual Insurance Co. v. Artesia State Bank, 5 Cir., 39 F.2d 400.

The infirmity in the original certificates of deposit for $250,000 each, issued by the bank to Caldwell & Company, stemmed from certain undeniably established interlocking transactions. Associated Life Companies, Inc., an insurance stockholding company, was completely controlled by Rogers Caldwell, its books being kept in the offices of Caldwell & Company, the employees of which without additional compensation did the routine work of the insurance stockholding company. Pursuant to negotiations on the previous night between Rogers

Caldwell and James B. Brown, president of the National Bank of Kentucky, at Brown's home, Caldwell, on August 21, 1930, delivered to the bank a promissory note for $500,000, executed by Associated Life Companies, Inc., and secured by $550,000 of bonds, as collateral.

The following letter was written on the bank's stationary and delivered:

"August 21, 1930.

"National Bank of Kentucky,
   "Louisville, Ky.

"Dear Sirs:

"You have today granted loan of $500,000.00 to this Company from which proceeds we have purchased two $250,000.00 Certificates of Deposit from your Bank in the name of 'Caldwell & Company.'

"We hereby agree and guarantee that these Certificates of Deposit will not be cashed only in reduction of the above mentioned loan.

"Yours very truly,
      "Associated Life Companies, Inc.
         "By: Thos. W. Goodloe,
                  "Secretary."

Simultaneously with the receipt of these documents, the National Bank of Kentucky issued and delivered to Caldwell & Company two negotiable certificates of deposit for $250,000 each.

In remanding the cause for retrial, this court pointed out that, in order to sustain a final judgment rendered upon mere statements of the case, admissions of attorneys "must clearly preclude recovery or defense, and broad and liberal interpretation must be made without too precise limitation of the meaning of specific words and phrases." Upon this broad basis of interpretation crediting the fair intendment of all averments and statements of the appellant and its attorney, the court considered that an offer of proof had been tendered "that Rogers Caldwell through the instrumentality of the various corporations dominated and controlled by him was engaged in perpetrating a fraud upon the bank, and that the Missouri State Life was a willing instrument in its perpetration."

The former opinion detailed items of proffered proof, and concluded that if "unchallenged or surviving destruction by adverse proofs," the evidence offered fully demonstrated that "the corporate will of Missouri State Life was exercised only by Caldwell, or at his bidding." It was as-serted that if directors or committees of a corporation abdicate, surrender their powers and subordinate their judgments and their wills to one dominating individual, hermetically seal their minds to the obvious, permit their corporation to be used as an instrumentality of deception, unlawfulness and fraud pursued continuously over a period of years, the corporation may not escape liability for failure of proof of its specific knowledge of one irregular transaction.

The former opinion stated, moreover, that no escape was visible from the "sole actor" doctrine, "even in the limited application that was made of it by this court in the third phase of Kean v. National City Bank [6 Cir.] 294 F. 214, and by the Supreme Court in Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 43 S.Ct. 570, 67 L.Ed. 956." Upon the assumed facts, no distinction was found in the applicability of the sole actor doctrine to the instant case from that made of it by this court in National City Bank v. Carter, 6 Cir., 14 F.2d 940, and National City Bank v. Carter, 6 Cir., 31 F.2d 25.

The court was careful to observe, however, that "the question of exclusive control is one of fact upon all the evidence, and the amount of stock owned by Caldwell is, on that issue, not at all conclusive." It was further asserted that the question of Caldwell's authority to bind the Missouri State Life Insurance Company by the agreement of the bank, concerning the use and application of the proceeds of the certificates, was an issue of fact to be decided by the district judge.

From the entire context of the former opinion, it should be obvious that what was there said was based upon the assumption of proof of all allegations of appellant's answer and the statement of defenses by its trial attorney, with every favorable inference to be reasonably drawn therefrom by liberal interpretation of the intendments of both pleader and advocate. The opinion discussed somewhat fully the assumed facts, as if proven; rationalized thereon; and sought to supply, as far as practicable in the state of the record, guidance upon the apparently applicable law of this complicated case. Nothing said was intended to foreclose the binding effect here of the findings of fact, which were directed to be made by the district court upon the evidence received at the trial, unless such

findings should be deemed clearly erroneous.

Although counsel have briefed and argued the case upon the facts largely by comparing factual statements in the former opinion with testimony received at the trial as either supporting or disproving each assumed fact, the method of counsel will not be followed in this opinion; but the controlling facts, as found by the district judge, will be narrated directly without reference to statements concerning corresponding subject matter in our former opinion.

After careful examination of the record, consisting of four printed volumes, aggregating 1747 pages of which 330 pages are exhibits, the district court's *determinative findings of fact, supported by substantial evidence and not deemed clearly erroneous,* will be narrated in indirect-discourse form.

On August 27, 1930, six days after the National Bank of Kentucky issued the two $250,000 certificates of deposit to Caldwell & Company, the latter endorsed and sold one of the certificates to the Missouri State Life Insurance Company for $250,000. This consideration was paid in full. On the same day the certificate of deposit was enclosed in a letter from the Insurance Company's assistant cashier, Raidt, to the Bank's president, Brown.

This letter requested that a new certificate of deposit, dated and due the same date and bearing the same rate of interest, be issued in lieu of the original certificate and made payable to the order of the Missouri State Life Insurance Company. The communication further requested that the Bank should write a letter, over the signature of an authorized officer, to the effect that upon maturity of the certificate, the money would be returned without cost to the Home Office of the Insurance Company in St. Louis.

On the night of September 4, 1930, Rogers Caldwell met James B. Brown, president, and Charles F. Jones, vice president, of the National Bank of Kentucky, in Brown's home and agreed that the letter of August 21, 1930, from Associated Life to the Bank would apply to Missouri State Life Insurance Company, and that the National Bank of Kentucky would be under no obligation to pay the two certificates except in liquidation of the $500,000 note executed by Associated Life of date August 21, 1930.

Next day, the assistant cashier of Missouri State Life wrote a letter to the president of the Bank "wondering why" a certificate of deposit for $250,000, in lieu of that payable to Caldwell & Company and endorsed by the latter, had not been received by the Insurance Company. Complaint was made that sufficient time had elapsed for delivery of the certificate and immediate delivery was demanded. There was repeated a request for a writing, signed by an authorized officer of the Bank, that the money covering the certificate of deposit would be sent to the office of the Insurance Company without cost upon presentation of the certificate for payment on its maturity date, which on the face of the certificate was "six months after date." On the same day, September 5, 1930, Jones, vice president of the Bank, wrote to Raidt, assistant cashier of the Insurance Company, that the letter of August 27th, from the Insurance Company, addressed to President Brown, who had been out of the city for a few days, had been handed to Jones for attention. The letter acknowledged receipt of the original certificate of deposit endorsed by Caldwell & Company, and stated that "as instructed we are enclosing herewith" a new certificate of deposit, bearing the same date, August 21, 1930, for $250,000, payable to the Missouri State Life Insurance Company.

Caldwell & Company, on September 13, 1930, sold the other certificate of deposit for $250,000 to the Missouri State Life, endorsed the certificate, and received $250,000 therefor. On the same date, the Insurance Company sent the certificate to the Bank in a letter substantially identical with that written on August 27th with respect to the first certificate of deposit purchased from Caldwell & Company. This transmittal letter was signed by Hempel, cashier of the Insurance Company.

In a letter dated September 16, 1930, Jones acknowledged receipt of the certificate of deposit, payable to and endorsed by Caldwell & Company; and a new certificate for the same amount was issued and delivered to Missouri State Life.

The two original certificates of deposit issued by the Bank to Caldwell & Company were stamped paid on September 5th and September 16th, respectively, on which dates two new certificates, each dated August 1, 1930, in lieu thereof were issued to Missouri State Life.

On September 23, Hempel, of the Insurance Company, by letter to Jones, of the Bank, asked compliance with previous requests for assurance in writing from the Bank that the money proceeds of the certificates, at maturity, would be returned without cost to the Home Office of the Insurance Company. A week later, Jones, in his official capacity, wrote to Hempel, as cashier of the Insurance Company, stating that when the two certificates "are paid the money will be remitted to the Home Office of your Company in St. Louis, Mo., without cost to you."

Concerning the transaction in question, the correspondence which has been detailed constituted the only communication of any kind between the Bank of Kentucky, or anyone representing it, and the Missouri State Life Insurance Company, or any of its directors, officers, or employees, with the single exception of Rogers Caldwell. So far as the record reveals, no representative of the Bank of Kentucky, or any other person, informed the Missouri State Life Insurance Company of any "side-agreements" that the certificates of deposit purchased by it would be cashed by the bank only in reduction of the loan of Associated Life Companies, Inc., or that the certificates were, in any way, different from what they plainly purported to be.

At the time of the transactions with the bank, the Missouri State Life Insurance Company was the third largest *stock* life insurance company in the United States and the eighteenth in size in this country among all life insurance companies, including the *mutuals*. It transacted a national business with investment departments in many large cities; and had some seven hundred employees in its home office. In 1930, its capital and surplus was $7,000,000, its admitted assets $151,000,000; its income $40,-000,000; and its disbursements $32,000,000. The company had 371,000 policies outstanding, aggregating $1,250,000,000 of insurance in force. There were some four thousand stockholders, and thirteen directors, many of whom were prominent men connected with important financial institutions in no manner related to enterprises of Rogers Caldwell.

At the time of the transactions involved in this litigation, Rogers Caldwell owned about thirty per cent of the capital stock of the insurance company, and exercised most powerful influence over its board of directors, agencies and enterprises. The evidence justified the district court's findings that Rogers Caldwell was the most dominant personality in the organization and exercised such influence that the insurance company "submitted to his guidance and direction in its investment branch to a dangerous degree;" but it is also true, as found by the district court, that the record contains ample evidence that the board of directors did not on all occasions comply with his will.

An Executive Committee was named, from the membership of the board, with broad power to pass upon investments. This committee was composed of Rogers Caldwell; his father, James E. Caldwell, president of a Nashville bank, with which Rogers and his companies had many dealings and ramifications; Hillsman Taylor, president of the company, who had been put in that office by Rogers Caldwell and was plainly dominated by him; Cary G. Arnett, president of the Inter-Southern Life Insurance Company, and also of Associated Life Companies, Inc., both Caldwell dominated corporations; and Charles Sargent, of New York, who rarely attended a meeting of the committee and was not present at the meeting on September 19, 1930, when the purchase of the certificates of deposit from Caldwell & Company by the Missouri State Life Insurance Company was approved. Large blocks of securities were purchased from time to time from Caldwell & Company with the approval of the committee. Undoubtedly, the committee was highly culpable in its neglect of duty in permitting the unloading of Inter-Southern Insurance Company securities on the Missouri State Life Insurance Company, for the benefit of Caldwell & Company and to the heavy financial detriment of Missouri State Life.

The board of directors of the insurance company, on November 14, 1930, ratified the action of the executive committee in approving the purchase of the two certificates of deposit; and we think the district court was justified by the evidence in finding that this ratification was without the knowledge of the directors of the transactions between Rogers Caldwell and James B. Brown and Charles F. Jones, concerning the condition precedent to the issuance of the original certificates, or the reissued certificates. No member of the executive committee and no officer, agent or employee

of the Missouri State Life Insurance Company, admitted that he had any knowledge whatever of any side-agreement at any time made by Rogers Caldwell modifying the unconditional language of the original or reissued certificates of deposit, or modifying the unconditional promise of the Bank of Kentucky to pay the certificates according to the tenor thereof. Nor does the record show that any knowledge was brought home to them of the transactions of the Associated Life with the bank, or of any negotiations or agreements between Rogers Caldwell and Brown and Jones. The district court found that none of the directors, officers, agents or employees of the insurance company, with the exception of Rogers Caldwell, had knowledge of any fact "which would have put a reasonably prudent person upon inquiry" with respect to any infirmity in either the original or the reissued certificates; and that all, except Rogers Caldwell, "acted in complete good faith" in connection with the purchase and exchange of the certificates of deposit and the payment therefor.

This affirmative finding of good faith was, in our judgment, too strong in expression; but, in the context, the absence of a showing of bad faith does not differ in legal effect from an assumption of good faith.

The evidence in the record supports the finding of the district court that Rogers Caldwell had no authority to bind the Missouri State Life Insurance Company, by restricting its right to collect at maturity the face proceeds of the certificates of deposit purchased from Caldwell & Company; or to relieve the National Bank of Kentucky from its obligation to pay, at maturity, the face value of the certificates, with interest, upon the order of Missouri State Life. Nor did he possess authority to modify, in any manner, the obligation of the Bank of Kentucky, evidenced in writing, or to destroy or diminish any legal rights of the insurance company with respect to the certificates of deposit.

The district court found that the corporate will of the insurance company was exercised not at the bidding of Rogers Caldwell but by "its own independent Board of Directors and its own independent corporate officers—all subject to the supervision and control of the Superintendent of Insurance of Missouri;" that neither the Board of Directors nor the Executive Committee and officers of the corporation surrendered their powers to Rogers Caldwell; and that while he had great power and influence in the decisions and determinations of the Board in the direction of its affairs, *"Rogers Caldwell was by no means the alter ego of Missouri State Life."*

Insofar as the district court found that Rogers Caldwell was by no means the *alter ego* of the insurance company the finding was upon the evidence clearly correct. But, we think, from reading the record, that it is over-statement to say that the directors and corporate officers acted with complete independence in their official capacities. While the majority of the Board members were individually neither dependent upon nor servile to Rogers Caldwell, the official functioning of the Board was far from free and untrammeled to the point of independence, though in certain instances, the Board of Directors did oppose his will.

The officers and executive committee members were not as independent of Caldwell as were the majority of the Board of Directors, and appear to have been complaisant in submission to his desires in the conduct of the corporate business; but we cannot say upon the proof that they surrendered their wills to that of Rogers Caldwell. From a broad aspect of the entire record, Rogers Caldwell neither possessed nor exercised power and dominance over the corporate affairs to such extent that he could be appropriately classified as either the "alter ego" of the corporation or the "sole actor" for it in the transactions herein involved.

The record establishes, as found by the district judge, that in his dealings with and representations made to the National Bank of Kentucky, including his oral agreement of September 4, 1930, Rogers Caldwell was acting exclusively for the advancement of his own interest and not that of the insurance company. Indeed, his actions were manifestly adverse to the interests of Missouri State Life. It was, of course, to his individual interest to conceal from that corporation, knowledge of the existence of the "side-agreement" of August 21, 1930, and his oral agreement of September 4, 1930, with Brown and Jones.

The district court found that the National Bank of Kentucky and its officers, Brown and Jones, did not believe that the corporate will of Missouri State Life was sub-

jugated to the will of Rogers Caldwell, that he was its *alter ego,* or that he had authority to bind it by his oral agreement of September 4, 1930. It was found further that the Bank and its officers knew facts which would have put a reasonably prudent person upon inquiry that Caldwell lacked power to bind the Missouri State Life by his fraudulent actions in such manner as to defeat the collectibility at maturity of the face value of the certificates of deposit, for which the insurance company paid face value, $500,000; that the Bank and its two dishonest officers knew that the original certificates of deposit, in view of the side-agreement respecting them, were void for any legitimate purpose; but nevertheless, "were willing partners and instruments" with Caldwell in passing the original certificates of deposit into the channels of trade. The district court found further that after the two original certificates were issued to Caldwell & Company, the Bank's officers, Brown and Jones, continued to assist Caldwell in his fraudulent purposes, by aiding him in the concealment from Missouri State Life of the existence of the side-agreement purporting to modify the obligation of the Bank to pay the certificates of deposit.

While there is no direct proof that Caldwell revealed to Brown and Jones his intention to defraud the Missouri State Life Insurance Company, the entire setting of the transactions between them justifies the inference drawn by the district court that Brown and Jones aided and abetted Caldwell in the consummation of his unlawful purpose.

On the strength of its findings of fact, the district court held the Missouri State Life Insurance Company to be a bona fide holder for value, in due course, without notice, of the two negotiable certificates of deposit for $250,000 each; that these certificates contained the plain, unambiguous and unconditional promise of the National Bank of Kentucky, to pay to the order of the insurance company the face value of the certificates, with 3% interest thereon from August 21, 1930, until the maturity of the certificates. The insurance company was held not to be bound by the "side-agreement" in writing of the Associated Life Companies, Inc. with the National Bank of Kentucky, or by the oral "side-agreement" of September 4, 1930, made by Caldwell with the Bank of Kentucky or with its officers, Brown and Jones.

The knowledge of Rogers Caldwell of these "side-agreements" was held not to be imputable to Missouri State Life for the reasons that Caldwell was not an authorized officer of the insurance company and had no actual, implied or apparent authority to bind it by any act or contract which he might attempt to do or make in its behalf; that Caldwell had never been authorized by action of the Board of Directors or its Executive Committee, or by its course of business, to act for or bind it by any contract or obligation entered into by him on its behalf; that Rogers Caldwell's interest was adverse to that of the Missouri State Life; and that he was not the "sole actor" for the insurance company in the transaction of its business and especially in its purchase of the two certificates of deposit.

The Receiver was held estopped from relying defensively on the "side-agreements," inasmuch as it was held that the National Bank of Kentucky had fraudulently concealed from the insurance company the existence of the "side-agreements".

Judgment was entered against the appellant Receiver of the National Bank of Kentucky in favor of the appellee General American Life Insurance Company (as successor in title to the assets of the Missouri State Life Insurance Company) for $500,000, and interest thereon at the rate of 3% per annum, from August 21, 1930, the date of issuance of the two certificates, to November 17, 1930, the date of the receivership. The judgment denied the recovery of any interest on dividends to be paid the insurance company by the Receiver.

■ The findings of the district court, except wherein we have specifically indicated to the contrary in the foregoing narrative, are supported by substantial evidence and certainly are not clearly erroneous. This case, therefore, comes back to us in a wholly different setting from that in which it was our duty to view it on the first appeal, where our function was to say whether on mere pleadings and statement of defenses by the defendant judgments should have been rendered in favor of the plaintiff.

It is now appropriate to discuss the law of the case. Adverting to the four authorities cited in our previous opinion, the agent whose knowledge was imputed

to his principal was undoubtedly in each instance, *as a matter of fact,* the "sole actor" for the principal in the transaction in controversy.

In Curtis, Collins & Holbrook Co. v. United States, 262 U.S. 215, 222, 223, 224, 43 S.Ct. 570, 572, 67 L.Ed. 956, the stockholders of a corporation entrusted its vice president and active manager, who was also a. stockholder, with the procurement of title to lands patented by the Government under the Stone and Timber Act. No safeguard was imposed except that the paper titles should be examined by a reputable attorney. The agent was to be paid a stated sum for each acre acquired. The lands were procured by fraud upon the Government, in which the agent participated as "sole actor for the company." His knowledge was imputed to the company upon the ground that he was the "sole agent acting for the company in securing titles to land for it." On suit of the Government, the land patents were directed to be cancelled for fraud in the procurement. Chief Justice Taft said: "The interest of Collins, Curtis and Holbrook in the acquisition of the titles was common. Curtis and Collins knew exactly how far Holbrook's interest was adverse to theirs, but trusted him in the joint enterprise notwithstanding. The adverse interest as between them in sharing the fruits of the common business cannot enable the company to retain its share and repudiate the agent with all he knew." The Chief Justice distinguished American National Bank v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310, on the ground that, there, a bank president "was engaged in something in which his interest was plainly independent of any agency of his on behalf of his bank."

In the case at bar, neither the directors nor the executive committee of the insurance company authorized Rogers Caldwell to act as its sole agent; nor were any ill gotten gains from his actions retained. The insurance company paid $500,000 in cash for $500,000 face value of certificates of deposit. Among other aspects in which the instant case is differentiable from Curtis, Collins & Holbrook Co. v. United States, supra, is the fact that, there, the other party to the transaction, the Government of the United States, in no manner participated in the fraud; while, here, Brown and Jones of the National Bank of Kentucky were by clear inference active conspirators.

One Huntley, vice president of the National City Bank of Memphis, played the leading role in each of the three other cases cited in our former opinion in discussion of the "sole actor" doctrine. Huntley, it seems, had a marked predilection for aiding "confidence men" and negotiating stolen bonds; and was known among shady characters of the underworld as a "right banker."

In Kean v. National City Bank, 6 Cir., 294 F. 214, it appeared that, in one of the transactions involved, Huntley 'sold ten thousand dollars of stolen negotiable bonds and collected the purchase money by drawing a draft in the name of the bank to the drawer's order, attaching the bonds thereto, and procuring from the teller currency for the face value of the draft. The method adopted gave all indicia of a sale by the bank to the purchaser, who so understood it. The court observed that Huntley's actions would seem to have been clearly within the apparent scope of his authority and so, upon well established principles of agency, his act would be considered the act of the bank. The court stated that Huntley, vice president of the bank, "was not purporting to deal with the bank as a stranger but purported to act, and did act, in his representative capacity, as agent, in the name of the bank." His actions in the transaction were to be considered those of the bank. Huntley's temporary custody of the bonds was not deemed to have changed his position as acting for the bank. The capacity in which he acted was said to be a question of fact. A directed verdict, in favor of the defendant bank, was reversed and the cause remanded for trial by jury, inasmuch as, viewing the evidence in the light most favorable to the plaintiff, the court was of opinion that reasonable men might differ upon "the extent of Huntley's knowledge." On other transactions, where Huntley did not purport to act as agent for the bank, but had the drafts cashed as any other depositor could have done, his knowledge that the drafts were given by good faith purchasers of stolen bonds was held not to be imputable to the bank.

Following remand, the law action was not again tried, but an equity suit, based upon the same transaction, was instituted by the same plaintiffs. With a minor omission,

the record in the first trial was filed by stipulation and additional evidence was adduced, upon consideration of which, the trial court dismissed the complaint; and the plaintiffs appealed. This court considered that the additional testimony supported the good faith of the bank through the activities of its president, and sustained its insistence that, by reason of Huntley's personal interest in the transaction, no presumption obtained that he communicated his guilty knowledge to the bank. Kean v. National City Bank, 6 Cir., 12 F.2d 203.

Thus, after all, in the Kean Cases, the "sole actor" doctrine was not so applied as to result in a recovery against the principal by imputation to it of the knowledge of an agent who exclusively handled the transactions.

As disclosed in National City Bank v. Carter, 6 Cir., 14 F.2d 940, 942, this same Huntley conspired with a professional confidence man to defraud a gullible old man, who had money in a West Virginia bank. As an essential step toward consummation of the scheme to defraud, the victim was induced to withdraw his funds from the West Virginia bank and deposit the money in a Memphis bank, from which he could quickly withdraw it for delivery to the swindler. For his assistance in the fraud, the crooked bank official was to receive ten per cent of whatever was filched. Shortly after the funds had been deposited in the Memphis bank, the victim came in, seeking to withdraw hurriedly the entire amount in cash. Huntley personally cashed his check, whereupon the victim turned the money over to the confidence man, who quickly disappeared. Soon becoming suspicious, the victim returned to the bank, where he was reassured by Huntley, who thereby aided in delaying complaint, thus affording the confidence man time to get away.

On this state of facts, the bank was considered liable for the participation of its vice president in the scheme of a third person to defraud a depositor, in violation of the duty of a bank to receive and keep the money of a depositor faithfully for his benefit. The performance of this duty was found to have been within the scope of Vice President Huntley's employment, and he was deemed to have been bribed so to conduct himself as vice president as to aid in defrauding the depositor. Judge Denison said: "Upon this theory the case is easily distinguishable from the Kean-Bank Cases [6 Cir.], 294 F. 214, and 12 F.2d 203, in which there was room to say that Huntley was dealing *with* the bank, representing himself or a hostile principal, rather than *for* the bank, as here, and should be classified with those cases which impute liability to the principal, rather than with those which decline to do so. * * * Hence we cannot say that a verdict should have been instructed for defendant."

The judgment for the plaintiff was reversed and the cause remanded for new trial upon the ground that the district court erred in admitting evidence concerning other shady transactions of Huntley. Upon re-trial of the case, each of the parties moved for a directed verdict, whereupon judgment was rendered against the bank. The record on appeal was conceded to be substantially similar to the record on the first appeal, and the court found no reason for departure from the views expressed in the previous opinion. No occasion was found for denial of relief to the plaintiff under the doctrine, "ex dolo malo non oritur actio." The judgment of the district court was affirmed. National City Bank v. Carter, 6 Cir., 31 F.2d 25.

■ In the clear light of differentiation in the fundamental facts of all the cases cited in our former opinion and those found upon the trial of this case in the district court, the authorities cited do not point the way to decision that Rogers Caldwell should be classified within legal contemplation as either the "alter ego" of or the "sole actor" for the Missouri State Life Insurance Company in the transactions by which it acquired title to the two certificates of deposit in controversy. Wherefore, the participation of Caldwell from the very inception of his deal with the bankers, Brown and Jones, in an attempt to destroy the negotiability of the certificates, is not chargeable to the insurance company, which subsequently acquired them, without knowledge of any infirmity, for a consideration equal to their full face value.

The decision of the Court of Appeals for the Second Circuit in Munroe v. Harriman, 85 F.2d 493, 494, 111 A.L.R. 657, is emphasized by appellant as supporting authority for its contention. In that case, the district court found as a fact that the loan committee of the bank, consisting of officers other than Harriman,

the president, was "completely dominated" by him and "habitually did whatever he requested." The Court of Appeals commented that the finding was not questioned by appellants "nor could they do so successfully." In the instant case, the district court found, on the contrary, that "the members of the Board of Directors and of the Executive Committee and the administrative and executive officers of the Missouri State Life, did not surrender their powers to Rogers Caldwell." The district court found, moreover, that the directors, officers, agents and employees of the insurance company had knowledge of no fact which would have put a reasonably prudent person upon inquiry concerning side-agreements between Rogers Caldwell and the National Bank of Kentucky, or its officers, or between Caldwell and the Associated Life, or its officers.

Harriman was found to have been the sole representative of the bank, which bore his name, in accepting securities which he unlawfully pledged as collateral to loans to his dummy corporations. Harriman's will alone was held to have caused "the making of the loan and the acceptance of the collateral." The Court of Appeals said that "he should be treated as the sole actor on behalf of the bank as fully as though he had physically placed the borrower's note and securities in the bank's vault and paid over the borrowed money without the knowledge of any other officer." In the instant case, the domination by Rogers Caldwell of the insurance company's affairs did not remotely approach the power wielded by Harriman over his namesake bank. Directors, officers and members of the executive committee alike disclaimed Caldwell's complete domination of their actions; and the proof fell short of contradicting their disclaimers. Though it was shown that, to aid him in fraudulent transactions, they were derelict in their duties on several occasions, the evidence failed to reveal that they had knowledge of any suspicious irregularity in the transactions pertaining to the certificates of deposit, or that they were subservient to Caldwell's commands in the acquisition, in due course of business, of apparently valid and unrestricted negotiable instruments.

Willcox v. Goess, 2 Cir., 92 F.2d 8, 11, cited by appellant, stemmed from the receivership of the Harriman National Bank and Trust Company of New York, and rested in factual basis on the absolute control exercised by Harriman over that bank. The principle of Munroe v. Harriman, supra, was applied to the effect that "although a principal is not charged with his agent's knowledge while engaged in a fraud upon him, if the principal must avail himself of a transaction entered into by the agent on his behalf, the guilty agent's knowledge will be imputed to him."

But here, the title to the certificates of deposit acquired by the Missouri State Life Insurance Company does not rest upon the exclusive acts of Rogers Caldwell. Several officers and employees of Missouri State Life performed various essential acts in behalf of the insurance company in the course of completion of the purchase of the original certificates from Caldwell & Company and the subsequent surrender of them to the National Bank of Kentucky for the issuance of new certificates of deposit, payable directly to Missouri State Life. On this record, Rogers Caldwell certainly does not appear to have been the sole actor for Missouri State Life in connection with the issuance by the bank, directly to the insurance company, of the new certificates of deposit.

Connecticut Fire Ins. Co. v. Commercial Nat. Bank of San Antonio, 5 Cir., 87 F.2d 968, 970, also relied upon by appellant, is not in point, for in that case a bank president "alone in his compartment with the seller, negotiated for and decided on the purchase of the bonds and consummated it by receiving the bonds and delivering the money." The Court of Appeals held in these circumstances that the bank president was the sole actor through whom the bank acquired the bonds, and that it was bound by the guilty knowledge and intent of its highest official as against the insurance company from whom the bonds were stolen.

The state court opinions cited by appellant have been carefully examined and do not, in our judgment, support its argument based on the sole actor doctrine. In nearly all those cases in which the principle was applied, the "sole actor" was vested with express authority to bind his principal. The factual situations presented in all cases cited by appellant clearly differentiate them from the case at bar.

Actually, there are relatively few cases in which the "sole actor" doctrine has been applied as a basis of decision. The so-called rule rests upon an exception to

an exception. Though sometimes stated more broadly, the general rule is that knowledge of an agent is imputable to his principal, when such knowledge concerns subject matter within the scope of the agent's authority and has been obtained in his capacity as agent. But, as was said by Mr. Justice Harlan in American Surety Co. v. Pauly (No. 1), 170 U.S. 133, 156, 158, 159, 18 S.Ct. 552, 561, 42 L.Ed. 977: "The presumption that the agent informed his principal of that which his duty and the interests of his principal required him to communicate does not arise where the agent acts or makes declarations not in execution of any duty that he owes to the principal, nor within any authority possessed by him, but to subserve simply his own personal ends or to commit some fraud against the principal. In such cases the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or having received notice of them, failed to disavow what was assumed to be said and done in his behalf." Among other authorities, Pomeroy on Equity Jurisprudence, Volume 2, Sec. 675, was cited by the Supreme Court to the effect that when an agent in the course of his employment has been guilty of fraudulent conduct for his own benefit at the expense of his principal, "as well as perhaps the other party," and the perpetration of the fraud required concealment of the facts from the principal, the latter is not chargeable with constructive notice of facts known by the agent and fraudulently concealed from the principal.

Chief Justice Taft, when writing for this court as Circuit Judge, said in Thomson-Houston Electric Co. v. Capitol Electric Co., 6 Cir., 65 F. 341, 343: "As a general rule, the principal is held to know all that his agent knows in any transaction in which the agent acts for him. [In re] Distilled Spirits, 11 Wall. 356, [20 L.Ed. 167]. This rule is said to be 'based on the principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of negotiation, and the presumption that he will perform that duty.' Such a presumption cannot be indulged, however, where the facts to be communicated by the agent to the principal would convict the agent of an attempt to deceive and defraud the principal. The truth is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." See and compare Lilly v. Hamilton Bank of New York, 3 Cir., 178 F. 53, 56, 29 L.R.A.,N.S. 558.

To the same effect, the Supreme Court in affirming a judgment of this court, in American Nat. Bank of Nashville v. Miller, 229 U.S. 517, 33 S.Ct. 883, 57 L.Ed. 1310, held that if a bank president, within the scope of his office, had knowledge of a fact which it was his duty to declare and not to his interest to conceal, his knowledge should be treated as that of the bank; but that where it was to his interest to conceal such knowledge, the law does not by fiction charge the bank with his knowledge. This holding was in a case where a private banker so far dominated a national bank, of which he was president, as to compel it frequently to take care of large balances against him, in the Clearing House, to the extent of more than fifty per cent of the capital stock of the national bank.

For numerous cases in which an agent has acted fraudulently, or in adverse interest to his principal, in such manner as to carve out an exception to the general rule of imputation to the principal of the knowledge of the agent, see the authorities cited in footnotes to the following texts: American Jurisprudence, Vol. 2, Sec. 379, pp. 298, 299; Ruling Case Law, Vol. 21, p. 843, Sec. 24, under title, "Principal and Agent;" 61 A.L.R., pp. 695 to 700, Annotation II.

The "sole actor" doctrine, which is an exception to the exception of non-imputability to the principal of the agent's knowledge, applies where an officer, though acting for himself or for a third person, is the sole representative of the corporation in the transaction in question. For illustration of the application and limitation of the rule, see cases cited in footnote to American Jurisprudence, Vol. 2, Sec. 380, p. 300, and in footnote to 61 A.L.R., pp. 704, 706, Annotation IV. See also annotations to Ætna Casualty & Surety Co. of Hartford, Connecticut v. Local Bldg. & Loan Ass'n., 86 A.L.R. 526, 537 [162 Okl. 141, 19 P.2d 612], and Knobley Mountain Orchard Co. v. People's Bank of Keyser, 48 A.L.R. 459, 464 [99 W.Va. 438, 129 S.E. 474].

Painstaking pilgrimage into the field opened up by these and other sources of legal investigation impels the conclusion that in no case closely akin to the instant controversy has the "sole actor" doctrine been so applied as to impute to a principal knowledge of the fraudulent conduct of an agent.

█ This opinion will not be lengthened by detailed discussion of the facts narrated in Ohio Millers' Mut. Ins. Co. v. Artesia State Bank, 5 Cir., 39 F.2d 400. Suffice it to say that, there, it was held that where one corporation purchased a certificate of deposit from another, which had the same president, his knowledge, acquired as an officer of the selling corporation, that the seller had obtained the certificate by fraud was not chargeable to the purchasing corporation. The decision upon the facts, as well as the rationale of the opinion of the Fifth Circuit Court of Appeals, supports the conclusion which we have reached that the sole actor doctrine is not applicable here.

The district court entered judgment against the appellant Receiver in favor of the appellee for an aggregate sum of $503,-541.66, consisting of $500,000 principal and $3,541.66 interest thereon, at the rate of 3% per annum from August 21, 1930, to November 17, 1930, the date of the receivership.

In paragraph 6 of the judgment it was provided that the appellee General American Life Insurance Company "shall not recover any interest on any dividends which shall be paid by the Receiver by reason of this judgment (Anderson v. Missouri State Life Ins. Co., 69 F.2d 794, at page 799 [C.C.A. 6th, March 12, 1934])."

█ The incorporation of paragraph 6 into the judgment entered by the district court was erroneous. By unquestioned authority the appellee General American Life Insurance Company is entitled to recover from the appellant Receiver legal interest at the rate of 6% per annum upon the 67% dividend and upon the 10% dividend, respectively, on its established claim of $503,-541.66, from the dates when like dividends were respectively paid to other creditors up to the date when corresponding dividends shall be paid to the appellee. Armstrong v. American Exch. Nat. Bank of Chicago, 133 U.S. 433, 470, 10 S.Ct. 450, 33 L.Ed. 747; Ticonic Nat. Bank. v. Sprague, 303 U.S. 406, 411, 58 S.Ct. 612,

82 L.Ed. 926; Chemical Nat. Bank v. Armstrong, 6 Cir., 59 F. 372, 384, 385, 28 L.R.A. 231.

From the record on the former appeal it appeared that the district court had erroneously awarded interest at the rate of 6% per annum from February 21, 1931, until paid on the full amount of the judgment of $503,541.66, entered in favor of appellee on the mere pleadings and statement of defenses. To prevent repetition of that erroneous action by the district court upon the trial to ensue, this court said [69 F.2d 794, 799]: "Inasmuch as the case must be remanded for trial, with appropriate findings of fact and conclusions of law, based upon the evidence, it is appropriate for us to say that in our opinion interest should not have been allowed upon the judgment beyond the date of the receivership. Gamble v. Wimberly [4 Cir.], 44 F.2d 329; White v. Knox, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603; Butler v. Western German Bank [5 Cir.], 159 F. 116; Richardson v. Louisville Banking Co. [6 Cir.], 94 F. 442."

In the context, and not with reference to the issue now before us *concerning the payment of interest on delayed dividends,* which was not discussed, the opinion added: "So far as this record shows, the funds available for the payment of depositors and other creditors will not be sufficient to pay all of the claims against the bank in full. The fund ought not to be depleted by the payment of interest beyond the date of the closing of the bank, even if the receiver's judgment in resisting the claim proves to be unsound."

The opinion in Armstrong v. American Exch. Nat. Bank of Chicago, 133 U.S. 433, 10 S.Ct. 450, 33 L.Ed. 747, supra, distinguished White v. Knox, supra, cited in our former opinion. It was pointed out that in White v. Knox, a judgment had been obtained on a litigated claim which included interest to a time beyond the date upon which a National Bank Receiver had paid ratable dividends of 65% to other creditors. The Comptroller of the Currency had been upheld in his calculations that the claimant should be paid a 65% dividend on the amount due him at the time the bank failed, and that the dividend should not be calculated on the claim *with interest to the time of the judgment.* Attention was called to the fact that in the *Armstrong* case the claim of the

plaintiff, as allowed, did not include interest beyond the date when the bank failed, and that interest upon the dividend which it ought to have received when declared by the Receiver was "a different matter." The language of the Supreme Court is plain: "The allowance of that interest is necessary to put the plaintiff on an equality with the other creditors. That point was not decided in White v. Knox, and we think the circuit court did not err in allowing such interest". 133 U.S. at page 470, 10 S.Ct. at page 462, 33 L.Ed. 747.

In Ticonic Nat. Bank v. Sprague, 303 U. S. 406, 411, 58 S.Ct. 612, 614, 82 L.Ed. 926, this principle was reaffirmed: "It is true that in the liquidation of national banks, dividends from the general funds on unsecured claims are made pro rata upon the amount of each claim as of the date of the insolvency, White v. Knox, 111 U.S. 784, 4 S.Ct. 686, 28 L.Ed. 603. This method of distribution gives a proportional part of the available funds to each creditor, in accordance with the statute requiring a 'ratable dividend.' Rev.St. § 5236. * * * Dividends are paid on that basis. It is in order to assure equality among creditors as of the date of insolvency that interest accruing thereafter is not considered. But interest is proper where the ideal of equality is served, and so a creditor whose claim has been erroneously disallowed is entitled on its allowance to interest on his dividend from the time a ratable amount was paid other creditors. Armstrong v. American Exch. Nat. Bank, 133 U.S. 433, 470, 10 S.Ct. 450, 33 L.Ed. 747.

Chemical Nat. Bank v. Armstrong, 6 Cir., 59 F. 372, 28 L.R.A. 231, conforms to the doctrine of the Supreme Court with respect to the allowance of interest on delayed dividends in national bank receiverships, and has become an oft cited, unchallenged authority. Judge Taft said: (59 F. at page 384) "It remains only to consider the interest on the dividends to be paid on the $100,000 which should have been allowed by the receiver in accordance with the opinion of this court at the time that he rejected the claim. The question at issue between the receiver and the Chemical Bank was one of such doubt that it would have been quite improper for him not to try it in court. The chance of his sustaining his view was sufficiently great to make any reasonable expense, in seeking to maintain it in court, a fair charge against the other creditors because of the possible benefit they might derive by a successful issue of the litigation. Now, a part of the reasonable expense of refusing to pay what is believed to be an unjust claim, but which is held thereafter to be a just one, is the damage from the delay to the person to whom the payment should have been made,—a damage which is measured by interest on the amount due and unpaid during such delay. It is equitable and just, therefore, that the share of the other creditors in the assets of the bank should be reduced by enough to pay the interest on the delayed dividends on the $100,000 from the date of the rejection of the claim until such dividends are paid. This conclusion is fully sustained by the decision of the supreme court in the case of Armstrong v. [American Exch. Nat.] Bank, 133 U.S. 433, 10 S.Ct. 450, [33 L.Ed. 747]."

Citing the opinion of this court just discussed, and also that of the Supreme Court in Armstrong v. American Exch. Nat. Bank, supra, the same principle was applied in a bank liquidation under state bank insolvency laws in Mothersead, State Bank Com'r of Oklahoma v. United States Fidelity & Guaranty Co., 8 Cir., 22 F.2d 644, 653, 654. See, also, Douglass v. Thurston County, 9 Cir., 86 F.2d 899, 910, 911. Cf. American Surety Co. v. Bethlehem Nat. Bank, D.C., 33 F.Supp. 722, 724; Id., 3 Cir., 116 F.2d 75, 77; Id., 314 U.S. 314, 62 S.Ct. 226, 86 L.Ed. 241, 138 A.L.R. 509. For further reference to the payment of interest on delayed dividends in the liquidation of insolvent banks, see 7 American Jurisprudence, p. 537, Sec. 746; 9 Corpus Juris Secundum, Banks and Banking, § 758, p. 1324.

If, as urged by the Receiver, the expression in First Nat. Bank of Chattanooga v. Bell, 6 Cir., 97 F.2d 683, 685, to the effect that the claimants were not entitled to interest from the date of the dividends paid by the receiver, indicates a contrary view to that herein voiced, with respect to the allowance of interest on delayed dividends, the former expression of this court is disapproved as in conflict with the controlling cases, Armstrong v. American Exch. Nat. Bank; Ticonic Nat. Bank v. Sprague, and Chemical Nat. Bank v. Armstrong, supra, which were not mentioned in that opinion.

Seaboard Surety Co. v. Spear, 6 Cir., 119 F.2d 849, 852, is cited by the Receiver. There it was merely held that the allowance of interest in a suit in equity is within the discretion of the court and will not be disturbed, unless discretion has been clearly abused. The plaintiffs, with alternative remedies, had elected to pursue first their remedy at law, and had delayed their suit in equity pending the outcome of that action. The withholding of the suit in equity was considered attributable to their own delay; and interest was denied.

Citing Redfield v. Ystalyfera Iron Co., 110 U.S. 174, 176, 3 S.Ct. 570, 28 L.Ed. 109, and City of Fort Worth v. McCamey, 5 Cir., 93 F.2d 964, 968, as authority, the receiver—all other grounds apart—urges that the General American Life Insurance Company should be denied interest for unreasonable delay in the prosecution of its claim. It is contended that for nearly four years after the mandate of reversal no action was taken by the insurance company toward having the case set for trial in the district court; and that for almost two years after the trial of the case had been finished, the insurance company failed to file its brief, causing comment by the district judge that "the great delay in the consideration of this case has been due to the failure of counsel for plaintiff [Missouri State Life] to file its brief." The district judge who originally tried the case died during the more than four-year interim between the mandate of reversal and the trial of the case. This sad occurrence doubtless occasioned a portion but certainly not all of the long delay. Excuses of absence and illness of counsel were made in explanation of the extreme delay in filing the brief requested by the district court and promised by the insurance company's attorneys.

It would be inequitable for the Receiver of the National Bank of Kentucky to be compelled to pay interest on the delayed dividends during such time as normal procedure was suspended because of inexcusable delay on the part of the attorneys for the insurance company in the prosecution of its claim to final judgment. In the present state of the record, it is impossible to ascertain what abatement of interest should be equitably allowed because of such unjustifiable delay. It will therefore be necessary to remand the cause to the district court for further hearing on this single issue. Upon this issue of delay in procedure, the district court is directed to receive evidence, to file appropriate findings of fact and conclusions of law, and to enter proper judgment.

Accordingly, the judgment of the district court is reversed as to Paragraph 6; with direction that judgment be entered in favor of the General American Life Insurance Company for six per cent interest upon the 67% dividend and upon the 10% dividend respectively, payable on its established claim of $503,541.66, from the dates when like dividends were paid to other creditors, up to the date when its dividends shall be paid to the General American Life Insurance Company; provided, however, that there shall be abated therefrom interest for such period of time as may be found to have been consumed as a result of inexcusable delay of attorneys for the insurance company in prosecuting its claim and in filing required briefs; and also interest shall be abated for a period of six months from the date our mandate herein is received and filed in the district court, which is deemed a reasonable time for determination of the issue for which the cause is remanded.

Except as herein modified, the judgment of the district court is affirmed.